1  MATT O'MALLEY (SBN 272802)
   PATRICK MCDONOUGH (SBN 288285)
2  San Diego Coastkeeper
   2825 Dewey Rd # 207
3  San Diego, CA 92106
   Ph: 619-758-7743
4  Email: matt@sdcoastkeeper.org

5  COAST LAW GROUP, LLP
   MARCO A. GONZALEZ (SBN 190832)
6  LIVIA BORAK BEAUDIN (SBN 259434)
   1140 South Coast Highway 101
7  Encinitas, CA 92024
   Ph: (760) 942-8505
8  Fx: (760) 942-8515
   email: marco@coastlawgroup.com

9

10              **UNITED STATES DISTRICT COURT**

11             **SOUTHERN DISTRICT OF CALIFORNIA**

12

13 SAN DIEGO COASTKEEPER, a non-profit      Civil Case No. **'19 CV 2222 MMA RBB**
   corporation; COASTAL
14 ENVIRONMENTAL RIGHTS                      **COMPLAINT FOR
   FOUNDATION,                               DECLARATORY AND
15 a non-profit corporation,                 INJUNCTIVE RELIEF AND CIVIL
                                             PENALTIES**
16
                      Plaintiffs,
17        v.                                 **(Federal Water Pollution Control Act,
                                              33 U.S.C. § 1251 *et seq.*)**
18
   REPUBLIC SERVICES, INC., a Delaware
19 corporation; OTAY LANDFILL, INC., a
   California corporation; SYCAMORE
20 LANDFILL, INC., a California corporation,

21                    Defendants.

22

23

24

25

26

27

28

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     Plaintiffs have issued 60-day notice letters ("Notice Letters") to Defendants Republic Services, Inc., Otay Landfill, Inc., and Sycamore Landfill. Inc. (collectively "Defendants"), as Owners and Operators of two separate industrial facilities regarding Defendants' violations of the Clean Water Act; California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("General Industrial Permit"); and the San Diego Regional Water Quality Control Board's ("Regional Board") Order No. R9-2014-0041, Conditional Waiver of Waste Discharge Requirements for Low Threat Discharges in the San Diego Region ("Conditional Waiver"). The Notice Letters informed Defendants of Plaintiffs' intention to file suit against Defendants to enforce the Clean Water Act, General Industrial Permit, and Conditional Waiver. Plaintiffs issued Notice Letters to the Otay Landfill Facility located at 1700 Maxwell Road, Chula Vista, California 91911 ("Otay Facility"), and to the Sycamore Landfill Facility, 8514 Mast Boulevard, Santee, California 92071 ("Sycamore Facility") on August 27, 2019. True and correct copies of the Notice Letters and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs also sent the Notice Letters to the registered agents for Defendants

and Defendants' parent company, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letters were served on Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letters and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.   <u>INTRODUCTION</u>

6.     Plaintiffs seek relief for Defendants' substantive and procedural violations of the General Industrial Permit and the Clean Water Act resulting from Defendants' activities at its Otay and Sycamore Facilities (collectively "Republic Facilities" or "Facilities").

7.     Specifically, Defendants have discharged and/or continue to discharge polluted storm water from the Otay Facility to downstream waters and groundwater including the Otay River and portions of the San Diego Bay; and from the Sycamore Facility to the San Diego River, and eventually the Pacific Ocean, in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendants have also violated and continue to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Industrial Permit.

9.      This complaint further seeks relief to prevent discharges in violation of the General Industrial Permit as amended by *Order No. 2014-0057-DWQ* ("2015 Permit") and the Conditional Waiver. These are ongoing and continuous violations of the Clean Water Act, the General Industrial Permit, and the Conditional Waiver.

10.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like those conducted at the Republic Facilities, flow into storm drain systems, local tributaries, the Otay River, San Diego Bay, the San Diego River, and the Pacific Ocean (collectively "Receiving Waters").

11.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12.     This discharge of polluted storm water and non-storm water from the Republic Facilities cause and/or contribute to the impairment of downstream Receiving Waters and compromise or destroy their Beneficial Uses.

13.     Storm water and non-storm water contaminated with sediment, heavy metals, pathogens, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.     The polluted discharges from the Republic Facilities also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Coastkeeper's and CERF's members. The public's use of the Receiving Waters for water contact recreation exposes people to bacteria, toxic metals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to these waters.

15.     Plaintiffs seek declaratory judgment, injunctive relief, the imposition of civil

penalties, and the award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the Clean Water Act and the General Industrial Permit.

## III.   PARTIES

### A.   Plaintiffs.

16.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

17.    San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's inland waterways, marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State, and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

18.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas, California 92024.

19.    CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

20.    Plaintiffs have thousands of members who live and/or recreate in and around

the Receiving Waters.  Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

21.     Defendant's failure to comply with the procedural and substantive requirements of the General Industrial Permit, Conditional Waiver, and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

22.     The violations of the General Industrial Permit, Conditional Waiver, and Clean Water Act at the Republic Facilities are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the General Industrial Permit, Conditional Waiver, and the Clean Water Act.

23.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

**B.     The Owners and/or Operators of the Republic Facilities.**

24.      Plaintiffs are informed and believe that Republic Services, Inc. is an active Delaware corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

25.     The Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") for the Otay Facility states that the Owner and/or Operator of the Facility is "Otay Landfill Inc" located at 8514 Mast Boulevard, Santee, California 92071.

26.     The NOI for the Sycamore Facility states that the Owner and/or Operator of the Facility is "Sycamore Landfill Inc" located at 8514 Mast Boulevard, Santee, California 92071.

27.     Plaintiffs are informed and believe and thereon allege that Otay Landfill, Inc. is the legal Owner and/or Operator of the Otay Landfill Facility, located at 1700 Maxwell Road, Chula Vista, California 91911.

28.     Plaintiffs are informed and believe and thereon allege that Sycamore Landfill, Inc. is the legal Owner and/or Operator of the Sycamore Landfill Facility, located at 8514 Mast Boulevard, Santee, California 92071.

29.     Plaintiffs are informed and believe and thereon allege that Otay Landfill, Inc. and Sycamore Landfill, Inc. are wholly-owned subsidiaries of Republic Services, Inc.

30.     Section 1.1 of the Storm Water Pollution Prevention Plans ("SWPPPs") for each of the Republic Facilities states that each property is "owned" and is "being operated" by Republic Services, Inc.

31.     Each of the SWPPPs and numerous other official documents related to the Republic Facilities' compliance with the General Industrial Permit and Clean Water Act indicates that such documents were "prepared for" Republic Services.

32.     Plaintiffs refer to the Otay Landfill Facility Owner and/or Operator and the Sycamore Landfill Facility Owner and/or Operator collectively as the "Republic Owners and/or Operators."

## IV.   LEGAL BACKGROUND

### A.     The Clean Water Act.

33.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by a NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

34.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

35.     "Waters of the United States" are defined as "navigable waters" and "all

waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

36.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2.

37.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

38.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *Rapanos v. United States*, 547 U.S. 715 (2006); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

39.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999–00.

40.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000–01.

41.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b);

40 C.F.R. § 125.3(a)(2)(ii)−(iii).

42.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

43.    A corporate entity is a "person" within the meaning of Section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

44.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

45.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $54,833 for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

46.    Section 505(d) of the Clean Water Act permits prevailing, or substantially prevailing parties, to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.     California's General Industrial Permit.**

47.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

48.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

49.    California is a state authorized by the EPA to issue NPDES permits.

50.     In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

51.     The General Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

52.     Between 1997 and June 30, 2015, the General Industrial Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

53.     On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued General Industrial Permit took effect.

54.     The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

55.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Industrial Permit by submitting an NOI to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

56.     Violations of the General Industrial Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

**C.     The General Industrial Permit Discharge Prohibitions.**

57.     The General Industrial Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 Permit § III.A.

58.     The Discharge Prohibitions provisions prohibits the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United

States. 1997 Permit § A.1; 2015 Permit § III.B.

59.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

60.     The General Industrial Permit prohibits "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies." 2015 Permit § III.D.

61.     The Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan") further establishes certain Waste Discharge Prohibitions. Basin Plan at 4-19.

62.     Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board." *Id*. at 4-20.

63.     Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 Permit.

64.     Each and every time a Facility Owner and/or Operator discharges unauthorized non-storm water from the Facility is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § A.1; 2015 Permit § III.B.

65.     Each and every time a Facility Owner and/or Operator discharges storm water or authorized non-storm water which causes or threatens to cause pollution, contamination, or nuisance is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § A.2; 2015 Permit § III.C.

66.     Each and every time a Facility Owner and/or Operator discharges storm

water or authorized non-storm water that violates any discharge prohibitions contained in applicable Basin Plans or statewide water quality control plans and policies is a violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 2015 Permit § III.D.

### D.    The General Industrial Permit Effluent Limitations.

67.    The General Industrial Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 Permit § V.A.

68.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

69.    Pursuant to the CWA and the General Industrial Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

70.    The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

71.    The EPA Benchmarks provide a relevant and objective standard for evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766–67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet at 50; EPA 2008 MSGP Fact Sheet at 106.

72.    Discharges from an industrial facility containing pollutant concentrations

that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

73.    The EPA Benchmark for TSS is 100 mg/L. 2015 MSGP Fact Sheet at 55–56.

74.    The EPA Benchmark for oil and grease is 15 mg/L. *Id.*

75.    The EPA Benchmark for pH is 6.0–9.0 s.u. *Id.*

76.    The EPA Benchmark for nitrate + nitrite nitrogen (N+N) is 0.68 mg/L. *Id.*

77.    The EPA Benchmark for total zinc in freshwater is 0.12 mg/L. *Id.*

78.    The EPA Benchmark for total copper in freshwater is 0.014 mg/L. *Id.*

79.    The EPA Benchmark for lead in freshwater is 0.082 mg/L. *Id.*

80.    The EPA Benchmark for total iron in freshwater is 1.0 mg/L. *Id.*

81.    The EPA Benchmark for total phosphorus in freshwater is 2.0 mg/L. *Id.*

82.    The EPA Benchmark for total copper in saltwater is 0.0048 mg/L. *Id.*

83.    The EPA Benchmark for total zinc in saltwater is 0.09 mg/L. *Id.*

84.    The EPA Benchmark for total lead in saltwater is 0.21 mg/L. *Id.*

85.    U.S. EPA regulations at 40 Code of Federal Regulations Chapter I Subchapter N ("Subchapter N") establish technology-based Effluent Limitation Guidelines and New Source Performance Standards for industrial storm water discharges from facilities in specific industrial categories. *See* 2015 Permit § I.K.58.

86.    The General Industrial Permit mandates that industrial storm water discharges from facilities subject to storm water effluent limitation guidelines in Subchapter N shall not exceed those storm water effluent limitation guidelines. 1997 Permit § B.1; 2015 Permit § V.B.

87.    The Clean Water Act regulations found in 40 C.F.R. Part 445 – Landfills Point Source Category, Subpart B RCRA Subtitle D Non-Hazardous Waste Landfill require facilities designated as solid waste (i.e., non-hazardous materials) landfills to monitor "contaminated storm water" for BOD, TSS, Ammonia (as N), α-Terpineol,

Benzoic acid, p-Cresol, Phenol, and Zinc. 40 C.F.R. §§ 445.1–3, 40 C.F.R. §§ 445.20–23.

88.     Subchapter N also sets forth specific effluent limitations for these parameters. 40 C.F.R. § 445.21.

89.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for BOD is 140 mg/L. *Id.*

90.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for TSS is 88 mg/L. *Id.*

91.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for ammonia as N is 10 mg/L. *Id.*

92.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for α-Terpineol is 0.033 mg/L. *Id.*

93.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for Benzoic acid is 0.12 mg/L. *Id.*

94.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for p-Cresol is 0.026 mg/L. *Id.*

95.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for Phenol is 0.026 mg/L. *Id.*

96.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for Zinc is 0.20 mg/L. *Id.*

97.     The Subchapter N effluent limitation applicable to non-hazardous waste landfills for pH is within the range of 6 to 9 mg/L. *Id.*

98.     Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the General Industrial Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

99.     Each and every time a Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the General

Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

100.   Each and every time a Facility Owner and/or Operator discharges polluted storm water or non-storm water in excess of Subchapter N effluent limitations is a violation of the General Industrial Permit and the Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § B.1; 2015 Permit § V.B.

**E.      The General Industrial Permit Receiving Water Limitations.**

101.   The General Industrial Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 Permit § VI.B.

102.   Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Industrial Permit's Receiving Water Limitations. *Id.*

103.   The General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

104.   Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

105.   The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

106.   WQSs applicable to dischargers covered by the General Industrial Permit include, but are not limited to, those set out in the San Diego Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

107.   The Basin Plan identifies "Beneficial Uses" for water bodies in the San

Diego region.

108.    Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131. The State is required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

109.    The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation. *Id.*

110.    The Beneficial Uses of Otay River include: Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Rare, Threatened, or Endangered Species; and the potential Beneficial Use of Contact Recreation. Basin Plan at Table 2-2.

111.    The Beneficial Uses of the San Diego Bay include: Contact Water Recreation; Non-Contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Threatened, or Endangered Species; Migration of Aquatic Organisms; Marine Habitat; Estuarine Habitat; Spawning Reproduction, and/or Early Development; Shell Harvesting; Commercial and Sport Fishing; Navigation; and Industrial Service Supply. *Id.* at Table 2-3.

112.    The Beneficial Uses for the San Diego River downstream of the Sycamore Landfill Facility's point of discharge include: Contact Water Recreation; Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Rare, Threatened, or Endangered Species; Agricultural Supply; and Industrial Service Supply. *Id.* at Table 2-2.

113.    The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply; Navigation; Contact Water Recreation; Non-Contact Water Recreation; Commercial and Sport Fishing; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Marine Habitat; Migration of Aquatic Organism; Spawning Reproduction, and/or Early Development; Shell Harvesting; Aqua Culture; and Rare,

1   Threatened, or Endangered Species. *Id.* at Table 2-3.

2       114.    Surface waters that cannot support the Beneficial Uses of those waters listed

3   in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of

4   the Clean Water Act, 33 U.S.C. § 1313(d).

5       115.    According to the Coastkeeper's monitoring data, publicly reported in the

6   California Environmental Data Exchange Network ("CEDEN"),[1] Otay River is impaired

7   for indicator bacteria such as E. Coli and enterococcus, and nutrients such as N+N, and

8   phosphorus.

9       116.    According to the 2016 303(d) List of Impaired Water Bodies,[2] the San

10  Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and

11  polychlorinated biphenyls ("PCBs"). Other parts of San Diego Bay are impaired for

12  benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal

13  coliform, and chlordane.

14      117.    According to the 2016 303(d) List of Impaired Water Bodies, the upper

15  reach of the San Diego River is impaired for enterococcus, low dissolved oxygen, and

16  sulfates.

17      118.    According to the 2016 303(d) List of Impaired Water Bodies, the lower

18  reach of the San Diego River is impaired for benthic community effects, cadmium,

19  enterococcus, nitrogen, low dissolved oxygen, phosphorus, total dissolved solids, and

20  toxicity.

21      119.    According to the 2016 303(d) List of Impaired Water Bodies, the Pacific

22  Ocean shoreline at the San Diego River outlet is impaired for indicator bacteria such as

23  enterococcus and total coliform.

24  _____

25  [1] This data and information is publicly available at
    https://ceden.waterboards.ca.gov/AdvancedQueryTool under the program titled "SDCK

26  Monitoring Program."

27  [2] 2014/16 Integrated Report – All Assessed Waters, *available at*
    https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml

28  (last accessed on October 29, 2019).

120.    Polluted discharges from industrial facilities, such as the Republic Facilities, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

121.    The Basin Plan sets forth WQSs for surface waters and enclosed bay and estuaries for various pollutants.

122.    The Basin Plan Objective for total iron is 0.3 mg/L for the Otay River and certain sections of the San Diego River. Basin Plan Table 3-2.

123.    The Basin Plan Objective for total iron is 1.0 mg/L for certain areas of the San Diego River in hydrological subareas 907.11 and 907.12. *Id.*

124.    The Basin Plan Objective for inland surface waters for total phosphorus is 0.1 mg/L. *Id.*

125.    The Basin Plan Objective for inland surface waters for total nitrogen is 1.0 mg/L. *Id.*

126.    The Basin Plan Objective for pH states that inland surface water "shall not be depressed below 6.5 or raised above 8.5." *Id.* at 3-26.

127.    From July 1, 2015, to March 21, 2019, the Basin Plan Water Quality Objective for inland surface waters for fecal coliform was 400 MPN/100 ml, and for enterococcus was 61 MPN/100 ml.

128.    Since March 22, 2019, the applicable Basin Plan Water Quality Objective for indicator bacteria states that the statistical threshold value may not exceed 320 cfu/100mL for E. coli in all waters where the salinity is equal to or less than 1 ppth 95 percent or more of the time. State Water Resources Control Board, Part 3 of the Water Quality Control Plan for Inland Surface Waters, Enclosed Bay, and Estuaries of California § III.E.2.

129.    Since March 22, 2019, the applicable Basin Plan Water Quality Objective for indicator bacteria states that the statistical threshold value may not exceed 110 cfu/100mL for enterococci in all waters where the salinity is greater than 1 ppth more than five percent of the time. *Id*.

130.   From July 1, 2015, to March 21, 2019, the Water Quality Control Plan for Ocean Waters of California ("Ocean Plan") set the single sample maximum for fecal coliform density at 400 per 100mL, and single sample maximum for enterococcus density at 104 per 100 mL. Ocean Plan § II.B.1.(1).

131.   Since March 22, 2019, the applicable Water Quality Objective for indicator bacteria in Ocean Waters is 110 cfu/100mL for enterococci. State Water Resources Control Board, Amendment to the Water Quality Control Plan for Ocean Waters of California § II.B.1.(1).

132.   The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

133.   The CTR sets forth maximum concentration levels of several toxic pollutants such that California can achieve health and environmental protection goals.

134.   The CTR sets forth the following maximum concentrations for freshwater inland surface water bodies, based on 100mg/L hardness: zinc – 0.12 mg/L; copper – 0.013 mg/L; lead – 0.065 mg/L. 40 C.F.R. § 131.38.

135.   The CTR sets forth the maximum concentrations for saltwater bays and estuaries. For example, lead is 0.21 mg/L; zinc is 0.09 mg/L; and copper is 0.0048 mg/L. 40 C.F.R. § 131.38.

136.   Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

137.   In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone."  65 F.R. § 31682-01, 31701.

138.   Similarly, the Basin Plan provides that absent any "allowance for dilution,"

waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

139.   Because the General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the General Industrial Permit. *See* 1997 Permit § C.2; 2015 Permit § VI.A; *see also Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

140.   "'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.'" *Natural Resources Defense Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) (quoting 40 C.F.R. § 122.41(a)).

141.   The General Industrial Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facilities. Each time discharges of storm water from the Facilities cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

142.   Each time discharges of storm water from the Facilities adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**F.     The General Industrial Permit Storm Water Pollution Prevention Plan Requirements.**

143.   Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the

requirements of the Industrial Permit. Sections X.A–B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015, or upon commencement of industrial activity.

144.   The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

145.   The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

146.   The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

147.   The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the General Industrial Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

148.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating

activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1–10; 2015 Permit §§ X.A–I.

149.   The General Industrial Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the General Industrial Permit. 1997 Permit §§ A.9–10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

150.   The General Industrial Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a–c; 2015 Permit § XV.

151.   Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Industrial Permit. 1997 Permit §§ A.9.d.i–vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Industrial Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the General Industrial Permit. *Id.*

152.   The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3–4; 2015 Permit §§ I.J.55, X.B.1.

**G.      The General Industrial Permit Monitoring and Reporting Requirements.**

153.    The General Industrial Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1–2, E.3; 2015 Permit, §§ X.I, XI.3.

154.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a–b; 2015 Permit §§ X.I, XI.

155.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

156.    The M&RP must ensure that storm water discharges are in compliance with the General Industrial Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

157.    The M&RP shall be revised as necessary to ensure compliance with the General Industrial Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

158.    The General Industrial Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit § B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

159.    Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil

---

[3] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

160.   The General Industrial Permit requires dischargers to revise the M&RP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

161.   The General Industrial Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

162.   The 1997 Permit defines Wet Season as October 1 through May 30. 1997 Permit § B.4.a.

163.   Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

164.   Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that were preceded by at least three (3) working days without storm water discharge.

165.   Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the facility over a five (5) year period. *See* 1997 Permit §§ B.5, B.7, B.15.

166.   Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm

event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

167.   The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b.

168.   Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

169.   Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

170.   Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

171.   Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

172.   Sections XI.B.6.a–b of the 2015 Permit require dischargers to analyze samples for TSS, O&G, and pH.

173.   Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants on a facility-specific basis.

174.   Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

175.     Section XI.B.6.d of the 2015 Permit requires each Facility to analyze samples for applicable industrial parameters related to each Facility's SIC code.

176.     The Clean Water Act regulations found in 40 C.F.R. Part 445 – Landfills Point Source Category, Subpart B RCRA Subtitle D Non-Hazardous Waste Landfill ("Subchapter N") require facilities designated as solid waste (i.e., non-hazardous materials) landfills to monitor "contaminated storm water" for BOD, TSS, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, Phenol, and Zinc, indicating that these pollutants are commonly present at municipal solid waste landfills. *See* 40 C.F.R. §§ 445.1–3, 40 C.F.R. §§ 445.20–23.

177.     Section XI.B.6.g of the 2015 Permit requires each Facility to analyze samples for additional parameters specifically required by Subchapter N.

178.     Subchapter N defines "contaminated storm water" as storm water that has come into contact with landfill wastes, waste handling and treatment areas, or landfill wastewater.

179.     The General Industrial Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

180.     The General Industrial Permit requires that signatories under Sections C.9–10 of the 1997 Permit, and Sections XX.K–L of the 2015 Permit, to make the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

/ / /

**H.     The General Industrial Permit Reporting Requirements.**

181.    Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

182.    Section C.11.d of the 1997 Permit required facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

183.    Section XVI of the 2015 Permit requires dischargers to submit an Annual Report to the applicable Regional Board by July 15 of each year. The Annual Report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

**I.     The 2015 Permit Exceedance Response Actions Requirements.**

184.    The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit §§ I.M.61−62; *id*. Table 2.

185.    When the 2015 Permit became effective on July 1, 2015, all permittees were

in "Baseline status." 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C.

186.   Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *See id.* § XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Storm water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of General Industrial Permit ("Level 1 Evaluation"). *Id.* §§ XII.C.1.a–c.

187.   Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.* § XII.C.1.c.

188.   Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. *Id.* §§ XII.C.2.a.i–ii.

189.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii.

190.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled

subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b.

191.   A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. *Id.* § XII.D.

192.   Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a through c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for (1) a new parameter in any drainage area, or (2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. *Id.* § XII.D.1.a.

193.   The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) if this information has changed since previous certifications. *Id.* § XII.D.1.b.

194.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *Id.* § XII.D.1.c.

195.   All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d.

196.   The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 Permit. *Id.* § XII.D.1.e.

197.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2

ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. *Id.* §§ XII.D.2.a–c.

198.   NAL exceedances as defined in the General Industrial Permit are not, in and of themselves, violations of the General Industrial Permit. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

199.   A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit."  *Id.* § I.M.63.

**J.      Conditional Waivers of Waste Discharge Requirements for Low Threat Discharges in the San Diego Region.**

200.   The Region 9 Conditional Waiver, Waiver No. 5 ("Conditional Waiver No. 5") requires dischargers of wastes at composting facilities to "not cause, threaten to cause, or contribute to conditions of pollution, contamination, or nuisance," and to implement BMPs that minimize or eliminate the discharge of pollutants that may adversely impact the quality or beneficial uses of waters. Conditional Waiver No. 5 §§ B.2.a., C.1.a.i, C.1.b.

201.   Conditional Waiver No. 5 also requires compost facilities to be designed, constructed and maintained to prevent wastes, additives, amendments or compost from inundation by surface flows associated with storm events. Conditional Waiver No. 5 § C.1.b.iv.

202.   Rainfall coming into contact with compost piles constitutes a waste stream or wastewater, and therefore cannot comingle with storm water, nor be discharged from a Facility. 2015 Permit § III.B–D.

/ / /

/ / /

# V.   FACTUAL BACKGROUND

## A.   Facility Site Information, Industrial Activities, and Pollutant Sources.

### 1.  The Otay Facility.

203.   The Otay Facility first obtained General Industrial Permit coverage to conduct industrial operations at the Otay Facility on November 10, 1997.

204.   The Otay Facility submitted its most recent Notice of Intent ("NOI") to the State Board to obtain General Industrial Permit coverage for the Facility on May 4, 2015 ("2015 Otay NOI"), under Waste Discharge Identification ("WDID") Number 9 37I013509, and identifies both the Facility site name and Facility operator as "Otay Landfill Inc."

205.   The Otay Facility's SWPPPs dated June 2015 ("2015 Otay SWPPP") and November 2016 ("2016 Otay SWPPP") (collectively "Otay Facility SWPPPs") both state that the "property is owned and operated by Republic Services."

206.   The Otay Facility's Level 2 ERA Plan dated December 2017, Level 2 ERA Soil Background Study dated December 31, 2018, and Level 2 ERA Technical Report dated June 2019 were all "prepared for Republic Services, Inc.," and state that the "property is owned and operated by Republic Services, Inc."

207.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed to file an accurate NOI regarding the Facility's proper owner and/or operator in violation of the General Industrial Permit. *See* 1997 Permit § III. Attachment 3; *see also* 2015 Permit § I.A.17, Attachment D.

208.   Plaintiffs are informed, believe, and thereon allege the Otay Facility enrolled under Conditional Waiver No. 5.

209.   The 2015 Otay NOI states the Otay Facility is approximately 516 acres. The NOI further identifies that 410 of these acres is industrial area exposed to storm water. *Id.* However, the 2015 Otay NOI does not state what percent of the site is impervious.

210.   The 2016 Otay SWPPP, dated November 2016 but not published or made publicly available via the SMARTS database until June 2017, states that the site

comprises approximately 464 acres, 230 of which are permitted for landfill operations. The 2016 Otay SWPPP does not state what percentage of the site is impervious.

211.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed to file either an accurate NOI, or an accurate SWPPP, regarding the Facility's acreage and impervious surfaces.

212.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility is currently an active industrial facility covered under the General Industrial Permit.

213.   The 2015 Otay NOI and the 2016 Otay SWPPP list the Standard Industrial Classification ("SIC") code for the Otay Facility as 4953 "Refuse Systems."

214.   The Otay Facility Owners and/or Operators describe the Facility as "an active Class III Municipal Solid Waste (MSW) landfill, primarily receiving municipal solid waste." 2016 Otay SWPPP § 2.1.

215.   According to the 2016 Otay SWPPP, the Otay Facility processes incoming waste materials by first sending this waste to the scale house and then to the active area of the landfill. *Id.* § 2.1.3.2. "Municipal waste is disposed of at the working face of the landfill and is temporally [sic] exposed during daily operations" *Id*. § 2.1. This waste is then to be "compacted and covered with a minimum of six inches of soil or an approved alternative cover." *Id.* According to the 2016 Otay SWPPP, "random inspections are performed to detect household hazardous wastes, which are then stored in on-site hazardous waste storage areas." *Id*. § 2.1.3.2.

216.   The 2016 Otay SWPPP states industrial operations at the Otay Facility include handling of solid waste, green waste, and recyclables materials; disposal of solid waste, green waste, and recyclables; hazardous materials handling and storage; mechanical parts handling and storage; storage and use of fuel and other flammable materials; recycling operations; vehicle and equipment maintenance; material handling and storage operations; dust/particulate generation and management; and the operation of a flare station. *Id.* § 2.1.3.

217.   On March 12, 1990, the San Diego Regional Water Quality Control Board

1   issued Order No. 90-09 which set for waste discharge requirements for the Otay Landfill.

2   218.   Order 90-09 authorized the Facility to accept a variety of different types of

3   waste streams including asbestos, wastes associated with shredding operations, and

4   sludge and dewatered sewage from wastewater treatment plants.

5   219.   On February 11, 2004, San Diego Regional Water Quality Control Board

6   issued Addendum No. 4 to Order No. 90-09, which authorized the mixing and placement

7   of specific Alternative Daily Cover ("ADC") using processed green material, and treated

8   sludge or treated sludge derived materials.

9   220.   The Facility SWPPPs fail to acknowledge that the Facility handles and

10   disposes of asbestos, wastes associated with shredding operations, sludge and dewatered

11   sewage from wastewater treatment plants, and processed green materials.

12   221.   According to a letter from the County of San Diego, Department of

13   Environmental Health dated July 20, 2018, the Otay Facility has engaged in composting

14   operations at the Facility since September 2013, and the composting operation handles up

15   to 75 tons of food materials per day, with storage area of up to 5,000 cubic yards, and a

16   peak annual loading capacity of 24,000 tons per year.

17   222.   According to a Regional Board Notice of Violation and Investigative Order

18   No. R9-2016-0067, issued July 11, 2016 ("Order No. R9-2016-0067"), during an

19   inspection on February 4, 2016, "staff observed leachate runoff from the up gradient

20   composting, and chip and grinding operations" at the Facility.

21   223.   The Facility SWPPPs have failed and continue to fail to acknowledge the

22   Facility engages in composting, and chipping and grinding operations.

23   224.   A staff enforcement letter from John R. Odermatt with the San Diego

24   Regional Board dated April 7, 2016 ("April 2016 Staff Enforcement Letter") noted that

25   leachate production at the Otay Landfill Facility may be as high as one million gallons

26   per month.

27   225.   The April 2016 Staff Enforcement Letter further explained that the high

28   liquid leachate levels had adversely affected landfill gas extraction wells to such an

extent that the wells had to be converted into liquid leachate recovery wells.

226.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility also engages in the following industrial activities: handling and disposal of asbestos, wastes associated with shredding operations, and sludge and dewatered sewage from wastewater treatment plants; mixing of sludge and green wastes to create ADC; application of ADC in multiple areas of the Facility; compositing operations; and chipping and grinding operations to provide plant waste to the compost windrows; and the operation of a leachate collection and removal system[S1].

227.   According to the Otay Facility SWPPPs, industrial materials associated with operations at the Otay Facility include: hazardous waste, municipal solid waste, contaminated waste sediment, anti-freeze, motor oil, transmission fluid, hydraulic fluid, grease, methane, landfill gas condensate, propane, diesel, recyclable materials, cathode ray tubes and other consumer electronic devices; asphalt stockpiles, treated wood waste, solvents, old batteries, and trash. *Id.* §§ 2.1.3.3–12; Table 2.1.a.

228.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility regularly handles biosolids such as sludge and dewatered sewage, auto shredder waste, landfill leachate, and composting materials. Order 90-09; Addendum No. 4 to Order 90-09.

229.   According to the Otay Facility SWPPPs, the areas of industrial activity at the Facility include: the active face of the landfill; equipment maintenance area; service vehicle parking area; fueling station; flare station; hazardous materials locker; construction and demolition area; numerous roads to transport various types of waste; and multiple detention and sediment basins, and areas for leachate-related storage and operations. *Id.* § 2.1.4.

230.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility further contains an area specifically designated for Research Composting Operations ("RCO").

231.   The 2016 Otay SWPPP acknowledges the following pollutants at the Otay

Facility: O&G, pH affecting substances, TSS, iron, gasoline and diesel fuels, grindings, sediment, trace metals, hydrocarbons, "gross pollutants," and "waste products." *Id.* at Table 2.1.a; Table 3.5.

232.   Plaintiffs are informed, believe, and thereon allege that pollutants commonly present in storm water discharged from facilities similar to the Otay Landfill include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, nitrite, nitrate, total nitrogen, and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; α-Terpineol; Benzoic acid; p-Cresol; Phenol turbidity; and total dissolved solids, among others. For example, the Clean Water Act regulations found in Subchapter N require facilities designated as solid waste (i.e., non-hazardous materials) landfills to monitor "contaminated storm water" for BOD, TSS, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, Phenol, and Zinc, indicating that these pollutants are commonly present at municipal solid waste landfills. *See* 40 C.F.R. §§ 445.1−3, 40 C.F.R. §§ 445.20−23.

233.   Plaintiffs are informed, believe, and thereon allege that these industrial activities occur at various locations throughout the Otay Facility either outdoors or without adequate cover to prevent storm water and non-storm water exposure to pollutant sources. Although the Facility has incorporated several secondary containment measures, the Facility does not entirely prevent polluted storm water and non-storm water from discharging from the facility.

234.   Plaintiffs are informed, believe, and thereon allege that many pollutants associated with the industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Otay Facility.

235.   Plaintiffs are informed, believe, and thereon allege that the pollutants associated with the Otay Facility have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking trash, pathogens, nutrient

pollutants, sediment, dirt, O&G, metal particles, and other pollutants off-site.

236.   Plaintiffs are informed, believe, and thereon allege that one or more of the regulated industrial activities is conducted at locations throughout the entire Otay Facility, and thus the entire Facility requires General Industrial Permit coverage.

237.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Otay Facility, no adequate BMPs or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

238.   Plaintiffs are informed, believe, and thereon allege that storm water from areas of the Otay Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and thus all storm water discharges from the Facility are regulated under the General Industrial Permit.

239.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Otay Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the Facility and into storm water discharge points, which flow to Receiving Waters.

240.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of non-storm water in violation of the General Industrial Permit and the Clean Water Act.

241.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the General Industrial Permit.

242.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit.

243.    Plaintiffs are informed, believe, and thereon allege that elevated levels of metals, pathogens, nutrients, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

244.    Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Otay Facility impact Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

### 2.  The Sycamore Facility.

245.    The Sycamore Facility first obtained General Industrial Permit coverage to conduct industrial operations at the Sycamore Facility on November 10, 1997.

246.    The Sycamore Facility submitted its most recent NOI to the State Board to obtain General Industrial Permit coverage for the Facility on May 4, 2015 ("2015 Sycamore NOI"), under WDID Number 9 37I013507, and identifies the Facility site name as "Sycamore Landfill" and Facility operator as "Sycamore Landfill Inc."

247.    The Sycamore Facility's SWPPPs dated June 2015, December 2015, and November 2016 ("2016 Sycamore SWPPP") (collectively, "Sycamore Facility SWPPPs") each state that the "property is owned and operated by Republic Services."

248.    The Sycamore Facility's Level 2 Exceedance Response Action Plan dated December 2017, Level 2 ERA Soil Background Study dated December 31, 2018, and Level 2 ERA Technical Report dated June 2019 were all "prepared for Republic Services, Inc.," and state that the "property is owned and operated by Republic Services, Inc."

249.    The 2015 Sycamore NOI states the Sycamore Facility is approximately 491 acres, 324 of which is industrial area exposed to storm water. *Id.* However, the 2015 NOI does not state what percent of the site is impervious.

250.    The 2016 Sycamore SWPPP confirms the Facility is 491 total acres, and clarifies that 324 acres are currently permitted for landfill operations. The 2016 SWPPP further clarifies that approximately five percent of the Facility is impervious. 2016 Sycamore SWPPP § 2.1.5.

251.   On December 12, 2018, the Regional Board issued Waste Discharge Requirements Order No. R9-2018-0069 ("Order R9-2018-0069") for the Sycamore Facility, which increases the Landfill's lateral waste disposal footprint from 324 acres to 352.6 acres. Order R9-2018-0069, Information Sheet at C-2.

252.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility is currently an active industrial facility covered under the General Industrial Permit.

253.   The 2015 Sycamore NOI lists the SIC code for the Sycamore Facility as 4953 "Refuse Systems," as well as 4213 "Trucking, Except Local."

254.   Although the Sycamore Facility SWPPPs list only SIC code 4953, information available to Coastkeeper and CERF indicate that both SIC 4213 and 4953 apply to the Facility. Therefore, Plaintiffs are informed, believe, and thereon allege that the entire Sycamore Facility requires General Industrial Permit coverage.

255.   According to the Owners and/or Operators of the Sycamore Facility, the Facility primarily engages in the landfilling of non-hazardous municipal solid waste at the Sycamore Landfill. 2016 Sycamore SWPPP § 2.1.3.1. The Facility SWPPPs state that hauling trucks transporting waste are checked at the scale house, and waste is thereafter transported via hauling vehicles to the active disposal site of the landfill. The SWPPPs also state that "small amounts of household hazardous waste are intercepted during random inspections that are either returned to the generator or are stored in the on-site hazardous waste storage lockers for proper disposal." *Id*.

256.   According to the Sycamore Facility SWPPPs, other industrial operations at the Facility include vehicle and equipment maintenance, hazardous material storage, green waste recycling, scrap metal storage and recycling, leachate storage and pumping, vehicle fueling, operation of a landfill gas flare station, storage of treated wood waste, other dust and particulate control activities, and application of soil and slope stabilization products such as mulch, green waste, and hydroseeding. *Id*. §§ 2.1.3.2–3.

257.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

Facility also accepts and disposes of the following waste streams: treated wood, dewatered sludge, dredged sediments, landfill leachate and condensate, contaminated soils, and other special wastes such as auto shredder waste, treated medical wastes, shredded tires, and dead animals. Order R9-2018-0069 §§ C.4–9; Order R9-2018-0069 Information Sheet § I at C-11.

258.   The Facility also conducts chipping and grinding operations. Order R9-2018-0069 § D.

259.   According to the Sycamore Facility SWPPPs, industrial materials associated with operations at the Sycamore Facility include: hazardous waste, municipal solid waste, contaminated waste sediment, leachate, anti-freeze, motor oil, transmission fluid, hydraulic fluid, grease, methane, landfill gas condensate, propane, diesel, recyclable materials, treated wood waste, solvents, old batteries, and trash. 2016 SWPPP §§ 2.1–9; Tables 2.1.a–c; Table 2-2 .

260.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility also regularly handles biosolids such as sludge and dewatered sewage, auto shredder waste, dredged sediments, green waste treated medical wastes, shredded tires, and dead animals. Order R9-2018-0069 §§ C.4–9; Order R9-2018-0069 Information Sheet § I at C-11.

261.   According to the Sycamore Facility SWPPPs, the areas of industrial activity at the Facility include: the active part of the landfill; equipment maintenance area; vehicle parking area; fueling station; flare station; hazardous materials locker; scrap metal storage area; oxygen, acetylene, nitrogen gas storage area; two leachate collection and storage areas; green waste recycling areas; numerous roads to transport various types of waste; and three extended detention basins. *Id*. at § 2.1.4.

262.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility further contains areas specifically designated for chipping and grinding operations, and treated wood disposal.

263.   The Sycamore Facility SWPPPs acknowledge the following pollutants at the

Sycamore Facility: O&G, pH affecting substances, TSS, iron, enterococcus, fecal coliform, gasoline and diesel fuels, grindings, sediment, trace metals, hydrocarbons, "gross pollutants," "waste products," leachate, and "varies." 2016 Sycamore SWPPP, Tables 2.1.a–b; Table 3.5.

264.    Plaintiffs are informed, believe, and thereon allege that pollutants commonly present in storm water discharged from facilities similar to the Sycamore Landfill include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, nitrite, nitrate, total nitrogen and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, copper, and iron; dissolved oxygen; α-Terpineol; Benzoic acid; p-Cresol; Phenol turbidity; and total dissolved solids, among others. For example, the Clean Water Act regulations found in Subchapter N require facilities designated as solid waste (i.e., non-hazardous materials) landfills to monitor "contaminated storm water" for BOD, TSS, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, Phenol, and Zinc, indicating that these pollutants are commonly present at municipal solid waste landfills. *See* 40 C.F.R. §§ 445.1–3, 40 C.F.R. §§ 445.20–23.

265.    Plaintiffs are informed, believe, and thereon allege that these industrial activities occur at various locations throughout the Sycamore Facility either outdoors, or without adequate cover to prevent storm water and non-storm water exposure to pollutant sources. Although the Facility has incorporated several secondary containment measures, the Facility does not entirely prevent polluted storm water and non-storm water from discharging from the facility.

266.    Plaintiffs are informed, believe, and thereon allege that many pollutants associated with the industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Sycamore Facility.

267.    Plaintiffs are informed, believe, and thereon allege that the pollutants associated with the Sycamore Facility have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through

1   ingress and egress. This results in trucks and vehicles tracking trash, pathogens, nutrient

2   pollutants, sediment, dirt, O&G, metal particles, and other pollutants off-site.

3   268.   Plaintiffs are informed, believe, and thereon allege that one or more of the

4   regulated industrial activities is conducted at locations throughout the entire Sycamore

5   Facility, and thus the entire Facility requires General Industrial Permit coverage.

6   269.   Plaintiffs are informed, believe, and thereon allege that even if regulated

7   industrial activities are not conducted at all locations throughout the entire Sycamore

8   Facility, no adequate BMPs or other controls exist to separate the storm water flows from

9   portions of the Facility where non-regulated activities may occur from storm water flows

10  from the regulated industrial activities.

11  270.   Plaintiffs are informed, believe, and thereon allege that storm water from

12  areas of the Sycamore Facility where industrial activities are conducted commingles with

13  storm water from other areas of the Facility, and thus all storm water discharges from the

14  Facility are regulated under the General Industrial Permit.

15  271.   Plaintiffs are informed, believe, and thereon allege that industrial activities

16  at the Sycamore Facility generate significant amounts of numerous pollutants. During

17  rain events, these pollutants are washed off surfaces throughout the Facility and into

18  storm water discharge points, which flow to Receiving Waters.

19  272.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

20  Facility Owner and/or Operator has failed and continues to fail to develop and/or

21  implement required BMPs to prevent discharges of non-storm water in violation of the

22  General Industrial Permit and the Clean Water Act.

23  273.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

24  Facility Owner and/or Operator has discharged and continues to discharge polluted storm

25  water and non-storm water from the Facility in violation of the General Industrial Permit.

26  274.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

27  Facility's polluted discharges have caused and/or contributed, and continue to cause

28  and/or contribute, to the impairment of water quality in Receiving Waters in violation of

1    the General Industrial Permit.

2        275.   Plaintiffs are informed, believe, and thereon allege that elevated levels of

3    metals, pathogens, nutrients, sedimentation, and other pollutants have resulted in the

4    inability of Receiving Waters to support their Beneficial Uses.

5        276.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges

6    of polluted storm water and non-storm water from the Sycamore Facility impact

7    Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading the quality

8    of those waters, and by posing risks to human health and aquatic life.

9    **B.    Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

10           **1.  The Otay Facility.**

11       277.   According to the 2016 Otay SWPPP, the Otay Facility consists of six

12   drainage areas. Drainage Area 3 ("DA-3") is divided into three subsections (3A, 3B, and

13   3C) and Drainage Area 4 ("DA-4") is divided into five subsections (4A, 4B, 4C, 4D, and

14   4E). 2016 Otay SWPPP § 2.1.5; 2016 Otay Site Map.

15       278.   According to the 2016 Otay SWPPP, Drainage Area 1 ("DA-1")

16   encompasses the western portion of the Facility, and contains undisturbed land, the

17   office, and scale houses, and drains towards the south. The SWPPP further claims that

18   "runoff from DA-1 flows into a sedimentation basin, which overflows into a second

19   basin," and ultimately discharges from storm water sampling site, OTY-2. OTY-2 is near

20   the entrance to the Facility, and consists of a perforated riser pipe surrounded by gravel

21   and filter fabric. *Id.* OTY-2 discharges to the Otay River. *Id.* Table 5.2.

22       279.   According to the 2016 Otay SWPPP, Drainage Area 2 ("DA-2"), located to

23   the northeast of DA-1, includes flow from the maintenance, fueling, construction, and

24   demolition areas.

25       280.   The Otay Facility site map indicates that DA-2 includes the current green

26   waste disposal area, and a vast area where landfill operations occur and have occurred.

27   The Otay Facility SWPPPs do not to acknowledge this. "Stormwater in DA-2 drains into

28   Sedimentation Basin 1 (SB-1)," which drains through an open riser structure equipped

with a storm water sampling location, OTX-2.

281.   OTX-2 connects to a storm drain inlet that drains in a southeasterly direction, underneath and off the Facility property directly to the Otay River.

282.   DA-3 is located along the northern rim of the Otay Facility, and is further broken down in to three sub drainage areas (3A, 3B, and 3C), each of which has a separate discharge point from the Facility, DP-3A, DP-3B, and DP-3C. According to the 2016 Otay SWPPP, no industrial activity occurs within DA-3.

283.   Plaintiffs are informed, believe, and thereon allege that waste hauling and other vehicles travel on access road through DA-3, and that dust and debris from other drainage areas of the Otay Facility settles on DA-3.

284.   DA-4A "includes the eastern portions of the [Otay] Facility which contain the active disposal area, green waste area, and Sedimentation Basin 3 ("SB-3")." 2016 Otay SWPPP § 2.1.5.

285.   According to the 2016 Otay SWPPP, "SB-3 is spilt into two sections by a large earthen berm and is graded such that water fills the eastern half of the basin first. The western end of SB-3 contains a riser pipe with filter fabric covered skimmers." Table 5.3 of the 2016 Otay SWPPP states that "[t]he storm drain from SB-3 runs in a southwest direction underground and flows into the sample location OTY-3 just before it leaves the site."

286.   The Otay Facility SWPPPs and site maps inconsistently refer to this sampling location as OTX-3 and OTY-3. *Compare* 2016 Otay SWPPP Tables 5.2 and 5.3, and 2015 Otay Site Map (referring to the discharge and sampling point as "OTY-3") *with* 2016 Otay SWPPP § 2.1.5 and Table 5.4 (referring to the same discharge and sampling point as "OTX-3"). Plaintiffs will refer to this discharge point as "OTY-3" as that is consistent with the Otay Facility Site Map.

287.   The 2016 Otay SWPPP and site map indicate that OTY-3 is located in the southeastern corner of DA-6 and discharges to Otay River. 2016 Otay SWPPP Table 5.2. Although SB-3 was constructed to retain storm water on site, information available to

Plaintiffs indicates that the Otay Facility has discharged, and continues to discharge, water from SB-3 via OTY-3.

288.    According to the 2016 Otay SWPPP, discharge point SW-5 "collects stormwater from the bin storage areas, the western portion of Maintenance Building 2 (hazardous material storage area), bin wash rack area, and a portion of the collection vehicle parking area." The SWPPP notes that SW-5 is fitted with a series of blocks, as well as silt sifters and a filtering metal grate. *Id*.

289.    The 2016 Otay SWPPP notes that the Facility pumps water stored in SB-3 for use in its dust control and/or irrigation for vegetation operations at the Facility. 2016 Otay SWPPP § 2.1.5.

290.    Plaintiffs are informed, believe, and thereon allege that water from SB-3, which contains runoff from the active portion of the landfill, as well as vast areas the landfill where municipal solid waste has been disposed, is not treated before reuse. As such, it is likely that storm water contained in SB-3 contains extremely high concentrations of an array of pollutants, which is then used at various locations  around the Otay Facility for dust suppression and irrigation purposes.

291.    According to the Otay Facility SWPPPs, sub-drainage areas DA-4B through DA-4E drain out of associated discharge points DP-4B, DP-4C, DP-4D, and DP-4E towards the southeast.

292.    The 2016 Otay SWPPP claims that no industrial activity occurs in DA-4B through DA-4E, and claims that as a result, no sampling is required. However, the Facility uses polluted storm water to irrigate vegetation, which includes areas of DA-4B through DA-4E.

293.    Plaintiffs are informed, believe, and thereon allege that industrial activities are taking place within DA-4B through DA-4E, such as storage of waste bins, and the transportation of trucks conveying waste and other industrial materials.

294.    According to the 2016 Otay SWPPP, Drainage Area 5 ("DA-5") includes the central area of the landfill where municipal solid waste has been disposed. 2016 Otay

SWPPP § 2.1.5. DA-5 is where leachate tanks are located, as well as SB-2, the smallest sedimentation basin on the site, which collects drainage from this area and includes a riser and skimmer similar to SB-3. "Stored water is pumped out and used as dust control and/or irrigation for vegetation at the Facility," and is also discharged from the Facility at discharge point OTX-1 when a storm event exceeds the capacity of the basin. *Id*.

295.    Plaintiffs are informed, believe, and thereon allege that truck transportation of wastes and other industrial materials occurs in DA-5.

296.    The Otay Facility SWPPPs state that Drainage Area 6 ("DA-6") "includes closed and inactive landfill area, as well as the flare station," and that "[r]unoff from DA-6 is directed towards sampling location OTX-3."

297.    Plaintiffs are informed, believe, and thereon allege that transportation of trucks hauling wastes and other industrial materials occurs in DA-6.

298.    According to the 2016 Otay SWPPP, all overflow discharges from SB-3, located in DA-4A, flow to OTY-3, which is located within DA-6. As such, storm water from DA-6 likely comingles with any storm water discharged from SB-3, and is eventually discharged from DA-6 at OTY-3. There is no detention basin located within DA-6, and therefore, OTY-3 is likely to discharge storm water during each and every QSE.

299.    Plaintiffs are informed, believe, and thereon allege that some storm water, in the form of sheet flows, discharges from DA-6 directly to the south and onto properties adjacent to the Otay Facility.

## 2. The Sycamore Facility.

300.    The Sycamore Facility Owner and/or Operator reports the Facility consists of three drainage areas, Drainage Areas 1, 2, and 3 ("DA-1," "DA-2", and "DA-3" respectively).

301.    The Sycamore Facility SWPPPs state that "topography of the facility slopes to direct surface water flow into the four existing sedimentation basins and the one detention basin." 2016 Sycamore SWPPP § 2.1.5. However, the site maps, as well as the

more detailed subsections of the SWPPPs, only identify three extended detention basins, and no other detention or sedimentation basins.

302.   According to the 2016 Sycamore SWPPP, DA-1 is a large drainage area which encompasses the eastern area of the property, including the active face of the landfill. Within DA-1 there is also a maintenance area, hazardous materials and hazardous waste storage, various aboveground storage tanks ("ASTs"), the maintenance trailer, mobile fueling truck parking, emergency generator, a 5,000-gallon odor control AST, energy dissipation, trash dumpster, scrap metal storage area, treated wood dumpster area, a 5,000-gallon leachate AST, and a compressed gas storage area. 2016 Sycamore SWPPP § 2.1.5.

303.   According to the Sycamore Facility SWPPPs, storm water from DA-1 is "directed from north to south through grading and channeling towards Extended Detention Basin 1" ("EDB-1"). *Id*. Nine storm drains are located along the southern border of DA-1 and direct water towards a channel which discharges into EDB-1. The SWPPP claims that "[a]ll stormwater in DA-1 is retained within [EDB-1]. Stormwater is skimmed off the top of the basin and is used as dust suppressant on site." *Id.*

304.   Plaintiffs are informed, believe, and thereon allege that some storm water from DA-1 has discharged from the Sycamore Facility along the eastern boundary and was not successfully diverted to EDB-1.

305.   Plaintiffs are informed, believe, and thereon allege that not all storm water that reaches EDB-1 is successfully retained, and thus some storm water is discharged from EDB-1 from time to time, for example following heavy rainfalls or multiple rainfall events, such as those that occurred in February 2019. For example, the Sycamore Facility's September 2016 Exceedance Response Action Level 1 Evaluation and Report ("2016 Sycamore Level 1 ERA Report") acknowledged that that the Facility's "sedimentation basins" in DA-1 and DA-2 "are designed to reduce sediment in discharge. Basins overflow to the Sycamore Canyon riparian area . . .." 2016 Sycamore Level 1 ERA Report § 7.

306.   Plaintiffs are informed, believe, and thereon allege that storm water from a significant portion of the northern and western areas of DA-1 flows down an internal road and other slopes, and into DA-2, although the Sycamore Facility site map indicates that all storm water within DA-1 is routed to EDB-1.

307.   As the Sycamore Facility SWPPPs and various ERA reports acknowledge, storm water from DA-2 is diverted through Extended Detention Basins 2 and 3 ("EDB-2" and "EDB-3" respectively), and is thereafter discharged from the Facility once EDB-2 and EBD-3 had reached capacity.

308.   According to the Sycamore Facility SWPPPs and site maps, DA-2 is located along the western side of the property and includes an outdoor staging area, scale and office, cofferdams, pump, water ASTs, a trash dumpster, and the green waste recycling area. 2016 Sycamore SWPPP § 2.1.5.

309.   According to the 2016 Sycamore SWPPP, storm water within DA-2 is directed from north to south into EDB-2, and overflow storm water from EDB-2 flows into EDB-3. "Storm water is then discharged to Little Sycamore Canyon Creek, which ultimately discharges to the San Diego River." *Id*.

310.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharged from EDB-1, EDB-2, or EBD-3 flows down Little Sycamore Canyon Creek and discharges from the Facility at SYC-1.

311.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharged from the Facility at SYC-1 flows to the San Diego River approximately one half mile downstream.

312.   According to the Sycamore Facility SWPPPs and site maps, DA-3 encompasses the most southeastern portion of the Facility, and includes a water AST, a 5,000-gallon condensate AST, two 12,000-gallon water ASTs, a 12,000-gallon red dye AST, and an infiltration trench located along the Facility ingress/egress road. *Id*. "Storm water in this area flows from east to west and then southwards towards the Facility main entrance/exit road." "Four storm drains direct storm water to the infiltration trench where

it is then directed out towards Little Sycamore Canyon Creek and SYC-1." *Id.*

## C. The Republic Facilities Violate General Industrial Permit Discharge Prohibitions.

313. Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities discharge storm water and non-storm water in violation of various absolute prohibitions enumerated in the General Industrial Permit.

### 1. The Otay Facility Has Violated and Continues to Violate General Industrial Permit Discharge Prohibitions.

314. Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has violated and continues to violate the General Industrial Permit's Discharge Prohibitions.

315. Plaintiffs are informed, believe, and thereon allege the Otay Facility has discharged unauthorized NSWDs in violation of the General Industrial Permit. *See* 1997 Permit § A.1; 2015 Permit § III.B. For example, the 2016 Otay SWPPP states that, "[a]ccess roads are sprayed by a water truck to limit the amount of dust from heavy equipment and truck traffic." *Id.* § 2.1.3.14. According to the 2016 Otay SWPPP, equipment cleaning occurs on site, indicating that wash water will be used in these processes. Plaintiffs are informed, believe, and thereon allege that the Otay Facility utilizes non-storm water and that NSWD commingles with storm water discharges and is discharged from the Facility.

316. The 2016 Otay SWPPP is silent on the use of BMPs meant to prevent wash water and water used for dust suppression from commingling and discharging from the Facility. Therefore, the Otay Facility Owner and/or Operator's assertion that "[t]here are no activities at this site that may result in unauthorized non-stormwater discharges" is erroneous, and in violation of the General Industrial Permit. *See id.* § 2.4.

317. Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator conducts these activities without adequate BMPs to prevent commingling of NSWD and storm water or to prevent these discharges in violation of the

General Industrial Permit.

318.   NSWDs resulting from dust suppression, irrigation, and equipment washing are not sources that are listed among the authorized non-storm water discharges in Special Conditions of the General Industrial Permit, and are thus always prohibited.

319.   The 2016 Otay SWPPP concedes that no non-storm water discharges are authorized at the Facility. 2016 Otay SWPPP § 2.4.

320.   Each time Defendants discharge prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

321.   Plaintiffs are informed, believe, and thereon allege the Otay Facility has discharged and continues to discharge pollutants in excess of the San Diego Basin Plan, or other statewide water quality control plans and policies, in violation of Discharge Prohibition III.D of the 2015 Permit.

322.   Storm water discharged from the Otay Facility has exceeded the Basin Plan Water Quality Objective for fecal coliform.

323.   The Basin Plan Water Quality Objective for fecal coliform is 400 MPN/100mL. *See* Basin Plan at p. 3-7.

324.   The Facility's December 12, 2014 monitoring data indicates that the Facility discharged storm water from three separate discharge points, OTX-1, OTX-2, and OTY-2, all of which contained concentrations of fecal coliform at or above 1600 MPN/100mL, the maximum concentration detectable under the testing method used.

325.   Additionally, the Facility's monitoring data from March 3, 2014 indicates that the Facility discharged fecal coliform in concentrations of 160,000 MPN/100mL from OTX-1, and 8,000 MPN/100mL from OTX-2.

326.   As each December 12, 2014 sample hit the upper limit given the method of

analysis, the actual results likely far exceeded 1600 MPN/100mL, already significantly in excess of the Basin Plan Water Quality Objective for fecal coliform of 400 MPN/100mL. *See* Basin Plan at p. 3-7.

327.   The Otay Facility's monitoring data also shows that every sampled discharge from the Facility since March 3, 2014 has exceeded the Basin Plan Objective of 0.3 mg/L for iron for the Otay River.

328.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted by the Regional Board applicable to the Otay Facility's discharges, or to the downstream Receiving Waters. As such, the analytical results of storm water sampling at the Facility demonstrate that the Otay Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan.

329.   Plaintiffs are informed, believe, and thereon allege the Otay Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of the General Industrial Permit. *See* 1997 Permit § A.2; 2015 Permit § III.C. For example, the Otay Facility's own monitoring data shows that on numerous occasions during the past five years the Facility has discharged fecal coliform, iron, TSS, and N+N, in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1. This sampling data shows that concentrations for each of the aforementioned pollutants far exceed various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.

## 2.   The Sycamore Facility Has Violated and Continues to Violate General Industrial Permit Discharge Prohibitions.

330.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility

Owner and/or Operator has violated and continues to violate the General Industrial Permit's Discharge Prohibitions.

331.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility has discharged NSWDs in violation of the General Industrial Permit. *See* 1997 Permit § A.1; 2015 Permit § III.B. For example, Section 2.6 of the 2016 Sycamore SWPPP notes that a "water truck is used at the landfill to minimize dust and particulate generation." Section 2.1.4 of the 2016 Sycamore SWPPP also acknowledges that that Facility contains "cleaning and rinsing areas" without further details regarding these areas.

332.   The Sycamore Facility SWPPPs fail to identify any specific BMPs meant to prevent NSWDs from these and other Facility activities from commingling and discharging from the Facility. Therefore, the Facility Owner and/or Operator's assertion that "[t]here are no activities at this site that may result in unauthorized non-stormwater discharges" is erroneous, and in violation of the General Industrial Permit. *See id*. § 2.4.

333.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator conducts these activities without adequate BMPs to prevent these discharges in violation of the General Industrial Permit.

334.   NSWDs resulting from dust suppression, irrigation, and equipment washing are not sources that are listed among the authorized non-storm water discharges in Special Conditions of the General Industrial Permit, and are thus always prohibited.

335.   The 2016 Sycamore SWPPP concedes that non-storm water discharges are not authorized at the Facility. 2016 Sycamore SWPPP § 2.4.

336.   Each time Defendants discharge prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

337.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility

has discharged and continues to discharge pollutants in excess of the San Diego Basin Plan, or other statewide water quality control plans and policies, in violation of Discharge Prohibition III.D of the 2015 Permit. For example, the San Diego Basin Plan sets forth a Water Quality Objective for iron of 1.0 mg/L for the San Diego River. *See* Basin Plan, Table 2-3. Yet, the Sycamore Facility's own storm water monitoring data shows numerous instances of high iron concentrations, which Plaintiffs allege adversely affect the beneficial uses of Receiving Waters.

338.   Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted by the Regional Board applicable to the Sycamore Facility's discharges, or to the downstream Receiving Waters. As such, the analytical results of storm water sampling at the Facility demonstrate that the Sycamore Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan.

339.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of the General Industrial Permit. *See* 1997 Permit § A.2; 2015 Permit § III.C. For example, the Sycamore Facility's own monitoring data shows that on numerous occasions during the past five years, the Facility has discharged iron, TSS, and nitrate + nitrite ("N+N"). *See* Ex. 1. This sampling data shows that concentrations for each of the aforementioned pollutants far exceed various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters.

**D.**   **The Republic Facilities Violate General Industrial Permit Effluent Limitations.**

340.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities have violated and continue to violate General Industrial Permit Effluent

Limitations during every significant rain event.

### 1. The Otay Facility Has Violated and Continues to Violate General Industrial Permit Effluent Limitations.

341.    Plaintiffs are informed, believe, and thereon allege that the Otay Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

342.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Otay Facility has exceeded the EPA Benchmark value for numerous pollutants. For example, the Facility's own monitoring data reflects that multiple storm water samples exceeded the EPA Benchmark for TSS of 100 mg/L. *See* Ex. 1. Additionally, the Facility's monitoring data indicates that multiple storm water samples exceeded the EPA Benchmark for iron of 1.0 mg/L. *See* Ex. 1; *see also* MSGP Fact Sheet at 55–56.

343.    The Facility's own monitoring data reflects that multiple storm water samples exceeded the Subchapter N effluent limitation for non-hazardous waste landfills for TSS of 88 mg/L. *See* 40 C.F.R. § 445.21–23.

344.    Thus, Plaintiffs are informed, believe, and thereon allege that the Otay Facility violated Sections B.1 of the 1997 Permit, and V.B of the 2015 Permit for exceeding Subchapter N effluent limitations.

345.    Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations.

346.    For example, Subchapter N requires facilities designated as Landfills to monitor "contaminated storm water," defined as storm water that has come into contact with landfill wastes, waste handling and treatment areas, or landfill wastewater, and sample such "contaminated storm water" for BOD, TSS, Ammonia (as N), α-Terpineol,

1   Benzoic acid, p-Cresol, Phenol, Zinc, and pH. *See* 40 C.F.R. §§ 445.1–3, 40 C.F.R.

2   §§ 445.20–23. However, the Otay Facility fails to monitor its storm water discharges for

3   any of these pollutants besides TSS and pH.

4        347.   The 2016 Otay SWPPP acknowledges the Facility is "subject to Subchapter

5   N ELGs Category 445, Landfills as a Point Source Category," indicating that these

6   Subchapter N pollutants are present at the Otay Facility. *See* 2016 Otay SWPPP § 2.1.2.

7        348.   Compliance with the effluent limitations set forth in Subchapter N

8   "constitutes compliance with the technology standard of [BAT/BCT]" for those

9   pollutants. Industrial General Permit Fact Sheet § J.5.

10       349.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility

11  Owner and/or Operator likely discharges numerous additional pollutants in excess of

12  EPA Benchmarks and Subchapter N effluent limitations. However, the Facility Owner

13  and/or Operator has failed and continues to fail to analyze storm water discharged from

14  the Facility for numerous pollutants, including Subchapter N parameters, that result from

15  the Facility's industrial operations.

16       350.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility has

17  discharged and continues to discharge numerous pollutants in excess of Subchapter N

18  effluent limitations in violation of the General Industrial Permit. 1997 Permit § B.1; 2015

19  Permit § V.B.

20       351.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility's

21  exceedances of EPA Benchmarks indicate the Facility has failed and continues to fail to

22  develop and/or implement BMPs that meet BAT/BCT.

23       352.   Plaintiffs are informed, believe, and thereon allege, from visual

24  observations, sample results, and investigations available to Plaintiffs, that the Otay

25  Facility has failed and continues to fail to develop and/or implement adequate BMPs to

26  prevent the discharge of polluted storm water from the Otay Facility. *See* 1997 Permit

27  § B.3; 2015 Permit § V.A.

28       353.   Each time the Otay Facility Owner and/or Operator discharges polluted

storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

354.   Each time the Otay Facility Owner and/or Operator discharges polluted storm water in violation of Subchapter N effluent limitations is a separate and distinct violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § B.1; 2015 Permit § V.B.

355.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards and Subchapter N effluent limitations.

356.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since August 27, 2014, and Coastkeeper and CERF will update the dates of violations when additional information and data become available.

357.   The Otay Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring August 27, 2014.

## 2. The Sycamore Facility Has Violated and Continues to Violate General Industrial Permit Effluent Limitations.

358.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

359.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Sycamore Facility has exceeded the EPA Benchmark value for numerous pollutants. For example, the Facility's own monitoring data reflects that multiple storm water samples repeatedly exceeded the EPA Benchmarks for TSS of 100 mg/L, iron of 1.0 mg/L, and N+N of 0.68 mg/L. *See* Ex. 1; *see also* MSGP Fact Sheet at

55–56.

360.   The Facility's own monitoring data reflects that multiple storm water samples exceeded the Subchapter N effluent limitation for non-hazardous waste landfills for TSS of 88 mg/L. *See* 40 C.F.R. § 445.21–23.

361.   Thus, Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility violated Sections B.1 of the 1997 Permit, and V.B of the 2015 Permit for exceeding Subchapter N effluent limitations.

362.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations.

363.   For example, Subchapter N requires facilities designated as Landfills to monitor "contaminated storm water," defined as storm water that has come into contact with landfill wastes, waste handling and treatment areas, or landfill wastewater, and sample such "contaminated storm water" for BOD, TSS, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, Phenol, Zinc, and pH. *See* 40 C.F.R. §§ 445.1–3, 40 C.F.R. §§ 445.20–23. However, the Sycamore Facility fails to monitor its storm water discharges for any of these pollutants but for TSS and pH.

364.   The 2016 Sycamore SWPPP acknowledges the Facility is "subject to Subchapter N ELGs Category 445, Landfills as a Point Source Category," indicating that these Subchapter N pollutants are present at the Sycamore Facility. *See* 2016 Sycamore SWPPP § 2.1.2. Compliance with the effluent limitations set forth in Subchapter N "constitutes compliance with the technology standard of [BAT/BCT]" for those pollutants. Industrial General Permit Fact Sheet § J.5.

365.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator likely discharges numerous additional pollutants in excess of EPA Benchmarks and Subchapter N effluent limitations. However, the Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged

from the Sycamore Facility for numerous pollutants, including Subchapter N parameters, that result from the Facility's industrial operations.

366.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility has discharged and continues to discharge numerous pollutants in excess of Subchapter N effluent limitations in violation of the General Industrial Permit. 1997 Permit § B.1; 2015 Permit § V.B.

367.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility's exceedances of EPA Benchmarks indicate the Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

368.   Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the Sycamore Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Sycamore Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A.

369.   Each time the Sycamore Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

370.   Each time the Otay Facility Owner and/or Operator discharges polluted storm water in violation of Subchapter N effluent limitations is a separate and distinct violation of the General Industrial Permit and Clean Water Act. 33 U.S.C. § 1311(a); 1997 Permit § B.1; 2015 Permit § V.B.

371.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards and Subchapter N effluent limitations.

372.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility has been in violation of these Effluent Limitations since August 27, 2014, and

1  Coastkeeper and CERF will update the dates of violations when additional information
2  and data become available.

3      373.   The Sycamore Facility Owner and/or Operator is subject to civil penalties
4  for all violations of the Clean Water Act occurring since August 27, 2014.

5      **E.    The Republic Facilities Violate General Industrial Permit Receiving**
6             **Water Limitations.**

7      374.   Plaintiffs are informed, believe, and thereon allege that each of the Republic
8  Facilities have violated and continue to violate General Industrial Permit Receiving
9  Water Limitations during every significant rain event.

10         **1.  The Otay Facility Has Violated and Continues to Violate General**
11              **Industrial Permit Receiving Water Limitations.**

12     375.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility has
13  violated and continues to violate General Industrial Permit Receiving Water Limitations
14  during every significant rain event. For example, the Facility's own storm water
15  monitoring data shows numerous instances of high concentrations of indicator bacteria
16  and N+N in excess of Basin Plan Water Quality Objectives. *See* Ex. 1.

17     376.   Following December 12, 2014, the Otay Facility Owner and/or Operator
18  ceased analyzing storm water samples for indicator bacteria without providing an
19  explanation or noting any specific BMPs that would eliminate bacteria from the Facility's
20  storm water discharges.

21     377.   Following December 12, 2014, the Otay Facility Owner and/or Operator
22  ceased analyzing its storm water discharges for N+N without providing an explanation or
23  noting any specific BMPs that would eliminate N+N from the Facility's storm water
24  discharges.

25     378.   Plaintiffs are informed, believe, and thereon allege the Otay Facility
26  continues to discharge indicator bacteria and N+N in excess of Basin Plan Water Quality
27  Objectives.

28     379.   According to San Diego Coastkeeper's Ambient Monitoring Program data,

which is publicly available via the CEDEN database online, the Otay River is impaired for indicator bacteria and nitrogen.

380.   Plaintiffs are informed, believe, and thereon allege the Otay Facility has discharged and continues to discharge indicator bacteria and N+N in excess of Basin Plan Objectives, and that such discharges cause and/or contribute to the indicator bacteria and nitrogen impairments of the Otay River.

381.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. For example, as noted *supra*, the Otay Facility handles numerous waste streams including municipal solid waste, shredder waste, and sludge and dewatered sewage, compost, and leachate.

382.   "[T]reated and untreated sludge can contain high concentrations of toxic metals and significant amounts of toxic organic pollutants and pathogens." Basin Plan at 4-74. Sludge also contains nitrogen, phosphorus, iron, zinc, bacteria, viruses, other disease causing organisms, and toxic chemicals from household, commercial, and manufacturing activities. *Id*.

383.   Shredder waste typically includes cadmium, total and hexavalent chromium, lead, copper, mercury, nickel, zinc, and PCBs, which cause auto shredder waste to be classified as hazardous. *Id*. at 4-75.

384.   "Compostable materials may contain nutrients, metals, salts, pathogens, and oxygen-reducing compounds that can degrade water quality if allowed to migrate into groundwater or surface water. The process of composting can allow contaminants to migrate with leachate or wastewater from these materials." State Water Board Order WQ 2015-0121-DWQ, Finding 6.

385.   Leachate typically contains high concentrations of bacteria, calcium, chloride, iron, lead, magnesium, manganese, potassium, sodium, zinc, mercury, arsenic, and humic and fulvic acids, among other pollutants.

386.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility discharges many or all of the aforementioned pollutants in excess of Basin Plan Objectives and CTR standards.

387.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Otay Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality standard], including the CTR").

388.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the Otay Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 Permit.

389.   Each time the Otay Facility Owner and/or Operator discharges polluted storm water in violation of the General Industrial Permit's Receiving Water Limitations is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

390.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the General Industrial Permit's Receiving Water Limitations.

391.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility has been in violation since August 27, 2014, and Plaintiffs will update the dates of violation when additional information and data becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

/ / /

/ / /

## 2. The Sycamore Facility Has Violated and Continues to Violate General Industrial Permit Receiving Water Limitations.

392.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility has violated and continues to violate General Industrial Permit Receiving Water Limitations during every significant rain event. For example, the Sycamore Facility Owner and/or Operator's own monitoring data shows numerous instances of high concentrations of iron in excess of Basin Plan Water Quality Objectives. *See* Basin Plan at 3-14, Table 3-2.

393.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed and continues to fail to analyze storm water discharged from the Facility for numerous pollutants that result from the Facility's industrial operations. As such, Plaintiffs allege that in addition to iron, the Sycamore Facility discharges numerous pollutants in concentrations exceeding Receiving Water Limitations.

394.   Plaintiffs are informed, believe, and thereon allege that numerous pollutants are present at the Sycamore Facility as a result of its industrial activities, and that as such, the Facility discharges concentrations of numerous pollutants in excess of Basin Plan Water Quality Objectives and CTR standards. For example, the Sycamore Facility accepts and disposes of sludge, and operates a complex leachate collection and removal system.

395.   Sludge contains nitrogen, phosphorus, iron, zinc, bacteria, viruses, and other disease causing organisms. Basin Plan at 4-74. Leachate typically contains high concentrations of bacteria, calcium, chloride, iron, lead, magnesium, manganese, potassium, sodium, zinc, mercury, arsenic, and humic and fulvic acids, among other pollutants.

396.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility has discharged and continues to discharge many of these pollutants, including indicator bacteria, nitrogen, phosphorus, and numerous toxic metals, in concentrations

1    exceeding WQSs.

2        397.   According to the 2016 303(d) List of Impaired Water Bodies, the lower

3    reach of the San Diego River downstream of the Sycamore Facility and into which

4    Facility discharges flow is impaired for indicator bacteria, nitrogen, phosphorus, and

5    toxicity among things, and is thus unable to support its designated Beneficial Uses.

6        398.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

7    Facility discharges numerous pollutants in excess of WQSs which cause and/or

8    contribute to the indicator bacteria, nitrogen, phosphorus, and toxicity impairments of the

9    Receiving Waters.

10        399.   Because the Basin Plan is an applicable WQSs under the General Industrial

11    Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the

12    Sycamore Facility contain concentrations of pollutants that cause or contribute to

13    violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2

14    of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See*

15    *Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water

16    Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality

17    standard], including the CTR").

18        400.   Plaintiffs are informed, believe, and thereon allege that discharges of

19    elevated concentrations of pollutants in the storm water from the Sycamore Facility also

20    adversely impact human health, thus violating the Permit Receiving Water Limitation C.1

21    of the 1997 Permit, and VI.B of the 2015 Permit.

22        401.   Each time the Sycamore Facility Owner and/or Operator discharges polluted

23    storm water in violation of the General Industrial Permit's Receiving Water Limitations

24    is a separate and distinct violation of the General Industrial Permit and Section 301(a) of

25    the Clean Water Act, 33 U.S.C. § 1311(a).

26        402.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

27    Facility's discharge violations are ongoing and will continue every time contaminated

28    storm water is discharged in violation of the General Industrial Permit's Receiving Water

1   Limitations.

2   403.   Plaintiffs are informed, believe, and thereon allege that the Sycamore

3   Facility has been in violation since August 27, 2014, and Plaintiffs will update the dates

4   of violation when additional information and data becomes available. Defendants are

5   subject to civil penalties for all violations of the Clean Water Act occurring since August

6   27, 2014.

7       **F.    The Republic Facilities' SWPPPs Fail to Comply with the General**

8           **Industrial Permit Requirements.**

9           **1.   The Otay Facility Owner and/or Operator Has Violated and**

10              **Continues to Violate General Industrial Permit SWPPP**

11              **Requirements.**

12  404.   The initial 2015 Otay SWPPP, dated June 18, 2015, was uploaded to the

13  SMARTS database by the Otay Facility Owner and/or Operator.

14  405.   The Otay Facility Owner and/or Operator revised the Facility SWPPP in

15  November of 2016 ("2016 Otay SWPPP") to incorporate several updates including BMP

16  modifications and additional pollutant source assessment parameters.

17  406.   The Otay Facility Owner and/or Operator revised the Facility SWPPP in

18  October of 2019 ("2019 Otay SWPPP"), 58 days after Plaintiffs mailed Notice Letters to

19  Defendants, to incorporate several updates including new QISP and Pollutant Prevention

20  team, a Pollutant Source assessment and demonstration study, changes to the Facility's

21  ERA status, BMP modifications, and industrial activities.

22  407.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility

23  Owner and/or Operator has not revised the Facility SWPPP at any other time, and that the

24  2019 Otay SWPPP is the current SWPPP that covers operations at the Otay Facility.

25  408.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility

26  Owner and/or Operator has conducted and continues to conduct operations at the Facility

27  with an inadequately developed and/or implemented SWPPP.

28  409.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility site

map has failed and continues to fail to accurately include all information required by the General Industrial Permit.

410.   The initial 2015 Otay site map, dated June 17, 2015, was uploaded to the SMARTS database by the Otay Facility Owner and/or Operator.

411.   The Otay Facility Owner and/or Operator revised the Facility site map in August of 2016 to incorporate several updates.

412.   The most recent site map publicly available via the SMARTS database is dated October 24, 2019, and was uploaded to the database October 26, 2019. These site maps, as well as the Otay Facility SWPPPs, fail to accurately label all areas of industrial activity. For example, the site maps and SWPPPs fail to acknowledge numerous industrial activities taking place in the Facility's various drainage areas.

413.   According to the 2016 Otay SWPPP, "runoff from DA-1 flows into a sedimentation basin, which overflows into a second basin," and ultimately discharges and storm water sampling site, OTY-2. 2016 Otay SWPPP § 2.1.5. The Facility site map, however, does not indicate the existence of any sedimentation basins within DA-1, and thus the Facility SWPPP and site map are inconsistent. The 2019 Otay SWPPP admits there is no detention basin in DA-1. 2019 Otay SWPPP § 2.1.6.

414.   According to the Otay Facility SWPPPs, no industrial activity occurs within DA-3, and the Facility Owner and/or Operator claims that no storm water sampling is required in DA-3. *Id*.

415.   Plaintiffs are informed, believe, and thereon allege that waste hauling, maintenance, and other vehicles travel on roads through DA-3, which track pollutants through this drainage area.

416.   Dust, trash, and other windblown pollutants from neighboring drainage areas of the Otay Facility also settle on DA-3 via aerial deposition. Thus, pollutants associated with industrial activities throughout the Facility are deposited on DA-3, and during rain events, pollutants originating from industrial activities comingle with pollutants within DA-3. Therefore, Plaintiffs are informed, believe, and thereon allege the Otay Facility

SWPPPs' characterization of DA-3 is inaccurate in violation of the General Industrial Permit.

417.   The Otay Facility SWPPPs claim that no industrial activity occurs in DA-4B through DA-4E, and that as a result, no sampling is required.

418.   Plaintiffs are informed, believe, and thereon allege that industrial activities are taking place within DA-4B through DA-4E, such as storage of waste bins and the transportation of trucks conveying waste and other industrial materials. There is a road in DA-4B that connects the Otay Facility with Republic's Chula Vista Hauling Facility, located at 881 Energy Way, Chula Vista, California 91911, where waste hauling vehicles and bins are washed stored, and otherwise maintained. Vehicles exiting the Otay Facility via DA-4B track numerous pollutants out of the Facility en route to the Chula Vista Facility for maintenance. Therefore, the 2016 Otay SWPPP's characterization of DA-4 is inaccurate in violation of the General Industrial Permit.

419.   The Otay Facility SWPPPs fail to acknowledge that truck transportation of wastes and other industrial materials occurs in DA-5 and DA-6, and that some storm water, in the form of sheet flows, flows from DA-6 to the south and onto properties adjacent to the Otay Facility.

420.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility SWPPPs and site map have failed to accurately identify, label, and describe all industrial activities and pollutant control measures at the Facility in violation of the General Industrial Permit. *See, e.g.*, 2015 Permit, §§ X.E.3.c, X.G.

421.   Plaintiffs are informed, believe, and thereon allege the Otay Landfill Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources.

422.   Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP *describes* each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process." (emphasis added).

423.   Plaintiffs are informed, believe, and thereon allege the Otay Landfill Facility engages in all of the following activities: handling and disposal of asbestos, wastes associated with shredding operations, and sludge and dewatered sewage from wastewater treatment plants; mixing of sludge and green wastes to create ADC; application of ADC in multiple areas of the Facility; compositing operations; and chipping and grinding operations to provide plant waste to the compost windrows.

424.   The Otay Landfill Facility SWPPPs fail to acknowledge all of these activities, and thus fail to describe numerous industrial activities conducted at the Facility in violation of the General Industrial Permit.

425.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment in violation of the General Industrial Permit.

426.   Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized [Non-storm water discharges ("NSWDs")]," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

427.   Plaintiffs are informed, believe, and thereon allege the Otay Facility SWPPPs fail to include any of the aforementioned elements required by Section X.G.2 of the 2015 Permit. For example, the only narrative assessment provided in the 2016 Otay SWPPP cursorily lists out the industrial activities conducted at the Facility, and summarily states "[p]ollutants that can potentially enter stormwater run-off and other

discharges draining from the facility include: Sediment (including vehicle traffic), Oil & Grease (waste oil and leaks from equipment); pH, and iron (naturally occurring in soils)."

428.   Plaintiffs are informed, believe, and thereon allege that given the activities, operations, and materials present at this Facility, the 2016 Otay SWPPP pollutant source assessment's conclusion that only sediment, O&G, pH, and iron could be discharged from a landfill facility is blatantly inaccurate, and in violation of the General Industrial Permit.

429.   The only pollutants identified in the 2016 Otay SWPPP's table of "Industrial Activities and Associated Materials" are sediment, trace metals, hydrocarbons, and "gross pollutants," without any further description or analysis. 2016 Otay SWPPP Table 2.1.a. Even this inadequate assessment of pollutants acknowledges that multiple metals and "gross pollutants" are present at the Facility, thus undermining the SWPPPs claims, made mere paragraphs prior, that only sediment, O&G, pH, and iron could be present in the Facility's storm water discharges.

430.   The 2019 Otay SWPPP acknowledges that indicator bacteria are present at the Facility and that these pollutants may be present in the Facility's discharges. However, the 2019 Otay SWPPP alleges indicator bacteria is not present as part of industrial activity. Moreover, the 2019 Otay SWPPP continues to fail to acknowledge the presence of heavy metals, nutrients, and numerous other pollutants at the Facility.

431.   Given the activities, operations, and materials present at this Facility, Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed and continues to fail to adequately and/or accurately identify, describe, and assess all potential pollutants at the Otay Facility related to industrial activities.

432.   The Otay Facility accepts sludge and dewatered sewage. "[T]reated and untreated sludge can contain high concentrations of toxic metals and significant amounts of toxic organic pollutants and pathogens." Basin Plan at 4-74. Sludge also contains nitrogen, phosphorus, iron, zinc, bacteria, viruses, other disease causing organisms, and

toxic chemicals from household, commercial, and manufacturing activities. *Id*.

433.    The Otay Facility accepts shredder waste. Shredder waste typically includes cadmium, total and hexavalent chromium, lead, copper, mercury, nickel, zinc, and PCBs, which cause auto shredder waste to be classified as hazardous. *Id*. at 4-75.

434.    The Otay Facility has engaged in composting operations since September 2013, and the RCO handles up to 75 tons of food materials per day, with storage area of up to 5,000 cubic yards, and a peak annual loading capacity of 24,000 tons per year.

435.    "Compostable materials may contain nutrients, metals, salts, pathogens, and oxygen-reducing compounds that can degrade water quality if allowed to migrate into groundwater or surface water. The process of composting can allow contaminants to migrate with leachate or wastewater from these materials." State Water Board Order WQ 2015-0121-DWQ, Finding 6.

436.    A Regional Board Notice of Violation and Investigative Order No. R9-2016-0067, issued July 11, 2016 ("Order No. R9-2016-0067"), noted that during an inspection on February 4, 2016, "staff observed leachate runoff from the up gradient composting, and chip and grinding operations" at the Facility. Despite this, the 2016 Otay Facility SWPPP fails to mention its composting or chipping and grinding operations in violation of the General Industrial Permit.

437.    The Otay Facility operates an extensive leachate collection and removal system. A staff enforcement letter from John R. Odermatt with the San Diego Regional Board dated April 7, 2016 noted that leachate production at the Otay Facility may be as high as one million gallons per month. This letter further explained that the high liquid leachate levels had adversely affected landfill gas extraction wells to such an extent that the wells had to be converted into liquid leachate recovery wells. *Id*.

438.    Leachate is "formed when rain water filters through wastes placed in a landfill. When this liquid comes in contact with buried wastes, it leaches, or draws out,

chemicals or constituents from those wastes."[4] Leachate typically contains high concentrations of bacteria, calcium, chloride, iron, lead, magnesium, manganese, potassium, sodium, zinc, mercury, arsenic, and humic and fulvic acids, among other pollutants.

439. The Otay Facility SWPPPs hardly mention leachate, noting only that the Facility has a 2,000-gallon leachate storage tank in one particular drainage area (DA-5), and that the landfill intends to prevent the discharge of leachate.

440. The Otay Facility Owner and/or Operator fails to explain the conditions and processes under which up to one million gallons of leachate per month is stored, treated, recirculated, discharged, or otherwise removed from the Facility in violation of the General Industrial Permit.

441. Plaintiffs are informed, believe, and thereon allege that numerous pollutants are present in the Otay Facility's storm water discharges in addition to TSS, O&G, pH, and iron, and that as such the Otay Facility SWPPP fails to account for numerous pollutants present at the Facility in violation of the General Industrial Permit.

442. Given the activities, operations, and materials present at the Otay Facility, Plaintiffs are informed, believe, and thereon allege that the Otay Facility SWPPPs fail to adequately and accurately assess the vast majority of the pollutants present at the Facility in violation of the General Industrial Permit's SWPPP requirements.

443. Plaintiffs are informed, believe, and thereon allege that, due in part to the Otay Facility SWPPPs' failure to adequately assess all pollutants and pollutant sources at the Facility, storm water discharged from the Facility contains numerous pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives in violation of the General Industrial Permit.

444. Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner

---

[4] *See* U.S. EPA Website, *Municipal Solid Waste Landfills*, https://www.epa.gov/landfills/municipal-solid-waste-landfills.

and/or Operator has also failed to adequately revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

**2. The Sycamore Facility Owner and/or Operator Has Violated and Continues to Violate General Industrial Permit SWPPP Requirements.**

445.   The initial Sycamore Facility SWPPP, dated June 18, 2015, was uploaded to the SMARTS database by the Sycamore Facility Owner and/or Operator.

446.   The Sycamore Facility Owner and/or Operator revised the Facility SWPPP in December of 2015 to incorporate several updates including BMP modifications and site contact information changes.

447.   The Sycamore Facility Owner and/or Operator revised the Facility SWPPP in November of 2016 ("2016 Sycamore SWPPP") to incorporate several updates including BMP modifications and pollutant source assessments.

448.   The Sycamore Facility Owner and/or Operator revised the Facility SWPPP in October of 2019 ("2019 Sycamore SWPPP"), 58 days after Plaintiffs mailed Notice Letters to Defendant, to incorporate several updates including new QISP and Pollutant Prevention team, a Pollutant Source assessment and demonstration study, changes to the Facility's ERA status, BMP modifications, and industrial activities.

449.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has not revised the Facility SWPPP at any other time, and that the 2019 Sycamore SWPPP is the current SWPPP that covers operations at the Sycamore Facility.

450.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

451.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility site map has failed and continues to fail to accurately include all information required by the General Industrial Permit.

452.   The initial 2015 Sycamore site map, dated June 17, 2015, was uploaded to the SMARTS database by the Sycamore Facility Owner and/or Operator.

453.   The Sycamore Facility Owner and/or Operator revised the Facility site map in January of 2016 to incorporate several updates.

454.   The most recent site map publicly available via the SMARTS database is dated October 30, 2018, and was uploaded to the database October 26, 2019. This site map, as well as the Facility SWPPPs, fail to accurately label all storm water conveyance systems, points of discharge, and direction of flow.

455.   Plaintiffs are informed, believe, and thereon allege that some storm water from DA-1 discharges from the Sycamore Facility along the eastern boundary and is not successfully diverted to EDB-1. However, all Sycamore Facility site maps and SWPPPs fail to acknowledge this flow pattern and the discharge of storm water from the eastern side of the Facility, which was extremely close to the active face of the landfill during certain time periods within the past five years.

456.   Although the Sycamore Facility site map indicates that all storm water within DA-1 is routed to EDB-1, and thereafter prevented from discharging, Plaintiffs are informed, believe, and thereon allege that storm water from a significant portion of the northern and western areas of DA-1 flows down an internal road and other slopes, and into DA-2. As the Facility SWPPPs and various ERA reports acknowledge, storm water from DA-2 is diverted through EDB-2 and EDB-3, and is thereafter discharged from the Facility in some instances.

457.   Plaintiffs are informed, believe, and thereon allege that not all storm water that reaches EDB-1 is successfully retained, and thus some storm water is discharged from EDB-1 from time to time, including following heavy rainfalls or multiple rainfall events, such as those that occurred this past February. For example, the 2016 Sycamore Level 1 ERA Report acknowledged that that the Facility's "sedimentation basins" in DA-1 and DA-2 "are designed to reduce sediment in discharge [sic]. Basins overflow to the Sycamore Canyon riparian area . . .." 2016 Sycamore Level 1 ERA Report § 7.

458.   As EDB-1 is the only storm water retention basin of any kind within DA-1, this report evidences that it was designed to temporarily hold storm water, not prevent discharges entirely. However, the Sycamore Facility SWPPPs and site maps fail to acknowledge these discharges in violation of the General Industrial Permit.

459.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate description of potential pollutant sources.

460.   Section X.G.1.a of the 2015 Permit requires dischargers to "ensure the SWPPP *describes* each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to the process." (emphasis added).

461.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility engages in the following activities: the operation of a chipping and grinding operations, and acceptance and disposal of sludge and dewatered sewage from wastewater treatment plants, dredged sediments, contaminated soils, auto shredder waste, shredded tires, and dead animals.

462.   Pollutants associated with these activities have been set forth in numerous sections *supra* including Sections V.E.1–2, and V.F.1, and Plaintiffs incorporate those paragraphs herein.

463.   The Sycamore Facility SWPPPs fail to acknowledge all of these activities, and thus fails to describe numerous industrial activities conducted at the Facility in violation of the General Industrial Permit.

464.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility SWPPPs and site map have failed to accurately identify, label, and describe all industrial activities and pollutant control measures at the Facility in violation of the General Industrial Permit. *See, e.g.*, 2015 Permit, §§ X.E.3.c, X.G.

465.   Section X.G.2 of the 2015 Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential

industrial pollutant sources." (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized [Non-storm water discharges ("NSWDs")]," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

466.   Plaintiffs are informed, believe, and thereon allege that given the activities, operations, and materials present at this Facility, the 2016 pollutant source assessment's conclusion that only sediment, O&G, pH, and iron could be discharged from a landfill facility is blatantly inaccurate, and in violation of the General Industrial Permit.

467.   The only pollutants identified in the 2016 Sycamore SWPPP's table of "Industrial Activities and Associated Materials" are O&G, hydrocarbons, trace metals, sediment, and "gross pollutants," without any further description or analysis. 2016 Sycamore SWPPP Table 2.1.b. Even this inadequate assessment of pollutants acknowledges that multiple metals and "gross pollutants" are present at the Facility, thus undermining the SWPPPs' claims, made mere paragraphs before, that only sediment, O&G, pH, and iron could be present in the Facility's storm water discharges.

468.   Given the activities, operations, and materials present at this Facility, Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed and continues to fail to accurately identify all pollutants present at the Facility as a result of industrial activities.

469.   Plaintiffs are informed, believe, and thereon allege that Table 3.5, the BMP summary table, fails to adequately identify the potential pollutants addressed by each BMP. The only potential "pollutants" identified by Table 3.5 are metals, petroleum products, non-hazardous waste, dust and particulates, diesel fuel and condensate, leachate, "varies," "various," and sediment.

470.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility SWPPPs fail to identify the vast majority of pollutants which are commonly present at facilities engaging in landfill operations, such as metals, pathogens, and nutrients.

471.   Plaintiffs are informed, believe, and thereon allege that numerous pollutants are present in the Sycamore Facility's storm water discharges in addition to TSS, O&G, pH, and iron, and that as such the Sycamore Facility SWPPPs fail to account for numerous pollutants present at the Facility in violation of the General Industrial Permit.

472.   Given the activities, operations, and materials present at this Facility, Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility SWPPPs fail to adequately and accurately assess the vast majority of the pollutants present at the Facility in violation of the General Industrial Permit's SWPPP requirements.

473.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator has also failed to adequately revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

### 3. Defendants Have Failed and Continue to Fail to Develop, Implement, and Revise the Republic Facilities' SWPPPs to Include BMPs that Reduce or Prevent the Discharge of Polluted Storm Water.

474.   Plaintiffs are informed, believe, and thereon allege that without properly identifying all industrial activities in the Republic Facilities' SWPPPs, the Republic Owners and/or Operators cannot and have not developed and/or implemented all appropriate BMPs at each facility.

475.   Plaintiffs are informed, believe, and thereon allege that the Republic Facilities' SWPPPs fail to include adequate site-specific information regarding all BMPs developed and/or implemented at the Facility. For example, Section 3.1 of the each of the 2015 Permits state "[a]ll minimum BMPs that are required by the IGP and necessary to meet the facility conditions will be implemented;" sections 3.1.1 through 3.1.7 of the 2016 Otay and Sycamore SWPPPs repeat the 2015 Permit language setting forth minimum BMP requirements; the 2016 SWPPPs' BMPs section cites to the CASQA

Stormwater BMP Handbook Portal for additional BMPs details; and Table 3.1 of the 2016 SWPPPs fail to indicate whether any of the BMPs listed will be implemented at the Facilities.

476.    Plaintiffs are informed, believe, and thereon allege that without properly identifying all significant materials in the Republic Facilities' SWPPPs, the Republic Owners and/or Operators cannot and have not developed and/or implemented all appropriate BMPs at each facility.

477.    Plaintiffs are informed, believe, and thereon allege that the Republic Facilities' SWPPPs fail to assess the BMPs at each Facility with respect to each Facility's potential pollutant sources.

478.    Exceedances of the General Industrial Permit Effluent Limitations, such as EPA benchmarks, and applicable Receiving Water Limitations, such as the CTR and Basin Plan, are indicators that a facility has failed to develop and implement BMPs that meet BAT/BCT.

479.    Defendants' own sampling data demonstrates that each of the Republic Facilities discharged storm water with concentrations of pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives.

480.    Because each of the Republic Facilities has discharged numerous pollutants in exceedance of Effluent Limitations and Receiving Water Limitations, Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have failed to develop and/or implement BMPs that:

      i.    adequately minimize the exposure of pollutants to storm water at the Facilities;

     ii.    adequately control and minimize polluted runoff from the Facilities;

   iii.    adequately treat and remove pollutants in storm water prior to the discharge;

    iv.    adequately prevent or control contaminated storm water from being discharged from the Facilities; and

v.   adequately prevent or control contaminated NSWDs from being

discharged from the Facilities.

481.   Plaintiffs are informed, believe, and thereon allege that that the Republic Owners and/or Operators have failed and continue to fail to develop and/or implement SWPPPs for each Facility that contain BMPs that achieve BAT/BCT in violation of the General Industrial Permit.

482.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have also failed to properly operate and maintain the structures and systems put in place at each Facility to achieve compliance with the General Industrial Permit and its SWPPP requirements.

483.   Plaintiffs are informed, believe, and thereon allege that each of the Republic Facilities' SWPPPs fail to analyze the effectiveness of each Facility's existing BMPs.

484.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have failed to evaluate and revise the SWPPPs of each Facility to ensure compliance with the General Industrial Permit, as required by Sections A.9–10 of the 1997 Permit, and Sections X.A.9 and X.B.1 of the 2015 Permit.

485.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Republic Facilities is in part a result of the Republic Owners and/or Operators' failure to develop, implement, and revise adequate SWPPPs.

486.   Plaintiffs are informed, believe, and thereon allege that, due in part to the Republic Facilities' SWPPPs' failure to adequately assess all pollutants and pollutant sources at each Facility, storm water discharged from each Facility contains numerous pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives in violation of the General Industrial Permit.

487.   Every day the Republic Owners and/or Operators operate each Facility with an inadequately developed and/or implemented SWPPP, and/or without properly revising each SWPPP, is a separate and distinct violation of the General Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

488.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit SWPPP requirements since at least August 27, 2014. These violations are ongoing, and Plaintiffs will include additional violations when information becomes available.

**G.    Defendants Have Failed to Develop, Implement, and/or Revise Adequate Monitoring and Reporting Programs at Each Republic Facility.**

489.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have conducted and continue to conduct operations at the Facilities with an inadequately developed, implemented, and/or revised M&RP.

490.   Plaintiffs are informed, believe, and thereon allege the Republic Owners and/or Operators have failed and continue to fail to sample and analyze for all parameters required by the General Industrial Permit. *See* 1997 Permit § B.5.c; 2015 Permit §§ XI.B.6.

491.   The 1997 Permit requires storm water samples be analyzed for TSS, pH, SC, total organic carbon or O&G, and other pollutants that are likely to be present in the facility's discharges in significant quantities. 1997 Permit § B.5.c. The 2015 Permit requires discharges to analyze all collected samples for TSS, O&G, pH, and all pollutants associated with the discharger's industrial activities. 2015 Permit §§ XI.B.6.a–d.

492.   Specifically, the 2015 Permit requires facility owners and/or operators to sample and analyze parameters on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c.

493.   Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

494.   Section XI.B.6.g of the 2015 Permit requires dischargers subject to Subchapter N to collect and analyze additional parameters specifically required by Subchapter N. Subchapter N section 445 requires facilities designated as solid waste landfills to monitor "contaminated storm water," defined as storm water that has come into contact with landfill wastes, waste handling and treatment areas, or landfill wastewater, and sample such contaminated storm water for BOD, TSS, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, Phenol, Zinc, and pH. 40 C.F.R. §§ 445.1–3, 40 C.F.R. §§ 445.20–23.

495.   Defendants analyze storm water samples only for the minimum parameters of TSS, O&G, iron, and pH at both the Otay and Sycamore Facilities.

496.   Plaintiffs are informed, believe, and thereon allege that pollutants commonly present in storm water discharged from facilities similar to both the Otay and Sycamore Facilities also include: pathogens such as enterococcus, E. coli, and fecal coliform; excessive nutrients such as ammonia as nitrogen, nitrite, nitrate, total nitrogen and phosphorus; metals such as aluminum, lead, zinc, manganese, selenium, and iron; dissolved oxygen; α-Terpineol; Benzoic acid; p-Cresol; Phenol turbidity; and total dissolved solids.

497.   In addition, due to the specific industrial activities conducted and industrial materials handled at the Facilities, cadmium, hexavalent chromium, nickel, PCBs, calcium, chloride, magnesium, potassium, sodium, mercury, arsenic, humic and fulvic acids, and other pollutants are also likely present at the Facilities, among others.

498.   Plaintiffs are informed, believe, and thereon allege that the Otay and Sycamore Facility SWPPPs fail to assess, or even acknowledge, any of the aforementioned pollutants in violation of the General Industrial Permit. *See* 2015 Permit §§ XI.B.6.c, XI.B.6.e, XI.B.6.g.

499.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have failed to consistently and/or adequately conduct visual discharge observations and monitoring of BMPs as required by the Permit's M&RP requirements.

500.   Plaintiffs are informed, believe, and thereon allege that the Republic Facilities' M&RPs have failed and/or continue to fail to ensure BMPs have been adequately developed and/or implemented, or revised if necessary. *See* 1997 Permit, §§ B.2.a–b; 2015 Permit §§ X.I, XI.

501.   Plaintiffs are informed, believe, and thereon allege that the Republic Facilities' M&RPs have failed and/or continue to fail to ensure storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations in violation of the General Industrial Permit. *See* 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

502.   Plaintiffs are informed, believe, and thereon allege that the Republic Owners and/or Operators have failed to revise each M&RP as necessary to ensure compliance with the General Industrial Permit. *See* 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

503.   Because the Republic Owners and/or Operators have failed to revise each M&RP as required by the General Industrial Permit, each M&RP fails to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility in violation of the Permit. *See* 1997 Permit § B.4.c; 2015 Permit § X.B.1.

**1. The Otay Facility.**

504.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the Otay Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters as required by the General Industrial Permit, and fails to collect samples from all discharge locations.

505.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed to sample for all parameters required by Subchapter N. The 2016 Otay SWPPP acknowledges the Facility is "subject to Subchapter N ELGs Category 445, Landfills as a Point Source Category." 2016 Otay SWPPP § 2.1.2. However, the Otay Facility fails to sample for almost all of these required parameters, with the

exception of TSS and pH, which are basic parameters required to be monitored by all industrial facilities covered by the General Industrial Permit.

506.   On June 25, 2019, the Otay Facility Owner and/or Operator uploaded an attachment to its Annual Report for the 2018−2019 Reporting Period to the SMARTS database which again acknowledges that the Facility is subject to Subchapter N, but which insinuates the Facility does not need to analyze storm water samples for Subchapter N parameters because it does not discharge "contaminated storm water."

507.   The 2018−2019 Annual Report claims the landfill is configured to prevent the discharge of storm water that comes into direct contact with landfill waste, the waste handling and treatment areas, landfill leachate, landfill gas condensate, and other landfill wastewater. The document also claims that any such waters "are routed to the landfill's leachate collection system and are hauled off site for disposal at the local Publicly Owned Treatment Works." However, neither of these claims are backed by evidence and the Facility has provided no further explanation in support of these conclusory statements.

508.   Plaintiffs are informed, believe, and thereon allege the Otay Facility's SWPPPs, site maps, and other documents fail to indicate that the Facility has implemented BMPs that would prevent all storm water from coming into contact with landfill waste, the waste handling and treatment areas, or other landfill wastewater; separate contaminated storm water from other storm water at the Facility; entirely prevent the discharge of contaminated storm water; and/or route all contaminated storm water to the leachate collection system.

509.   As the Otay Facility has failed to analyze any storm water discharges for all Subchapter N parameters, the Otay Facility Owner and/or Operator has violated and continues to violate Section XI.B.6.g of the 2015 Permit.

510.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed to sample for several constituents likely to be present at the Facility in violation of section XI.B.6.c of the 2015 Permit. For example, despite engaging in landfill operations, the Facility Owner and/or Operator only samples for the

1   minimum parameters of TSS, O&G, pH, and iron.

2       511.    The Otay Facility Owner and/or Operator analyzed its past storm water

3   discharges for fecal coliform and N+N on March 3, 2014, and December 12, 2014. Every

4   sample collected far exceeded the Basin Plan Objective standard for fecal coliform of 400

5   MPN/100mL, and multiple samples exceeded both the EPA benchmarks and Basin Plan

6   water quality objectives for N+N.

7       512.    The Otay Facility Owner and/or Operator ceased sampling for fecal

8   coliform, or any other indicator bacteria, as well as N+N, after December 12, 2014,

9   without providing explanation or implementing any BMPs to reduce and/or prevent

10   discharges of bacteria or nutrients in the Facility's storm water.

11       513.    This evidence indicates that fecal coliform and various other indicator

12   bacteria, and N+N and other nutrients, are present at the Otay Facility, yet the Otay

13   Facility Owner and/or Operator continues to fail to analyze samples for any indicator

14   bacteria or nutrients in violation of the General Industrial Permit. *See* 1997 Permit

15   § B.5.c; 2015 Permit § XI.B.6.c.

16       514.    Plaintiffs are informed, believe, and thereon allege that the Otay Facility

17   Owner and/or Operator has failed and continues to fail to develop and/or implement a

18   M&RP that requires the collection of storm water samples from all discharge locations at

19   each Facility in violation of Section XI.B.4 of the 2015 Permit. For example, the Otay

20   Facility has only collected storm water from OTY-3 on one occasion, on April 3, 2017.

21       515.    Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner

22   and/or Operator has failed to collect samples from each discharge point during a given

23   QSE in violation of the General Industrial Permit. For example, the Otay Facility Owner

24   and/or Operator has only collected a storm water sample from a single discharge point for

25   each of the past twelve storm water sampling events but for one event. Not every

26   drainage area at the Otay Facility has a detention basin or other storm water capture

27   system. Thus, during each QSE, storm water will discharge from the Facility at more than

28   one discharge point.

516.   Plaintiffs are informed, believe, and thereon allege that the method detection limits used by the Otay Facility Owner and/or Operator for some parameters were not appropriate to determine compliance with the General Industrial Permit's Effluent Limitations and Receiving Water Limitations. For example, the maximum value used for total coliform on December 12, 2014, by the Otay Facility was only 1,600 MPN/100 mL. As the total coliform concentrations hit the upper limit for both of these tests, and the maximum allowable total coliform concentration under the Basin Plan is 10,000 MPN/100 mL, the maximum of only 1,600 used to analyze the December 12, 2014 sample was improper.

517.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator failed to collect samples for the requisite number of QSEs. For example, while the General Industrial Permit requires Permittees to collect four samples each reporting period, the Otay Facility only collected one sample between the July 1, 2018 and December 31, 2018 reporting period, despite the occurrence of numerous QSEs during that reporting period. *See* Ex. 1.

518.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operator has failed to "submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event." 2015 Permit § XI.B.11.a. For example, the Facility collected a storm water sample from OTX-1 on February 14, 2019, submitted the results to a laboratory for analysis on February 16, 2019, and received the results on or about March 7, 2019. However, the Facility Owner and/or Operator failed to submit these results to SMARTS until June 27, 2019.

519.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

520.   Every day the Otay Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP, is a separate and distinct

violation of the General Industrial Permit and the Clean Water Act. The Otay Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit M&RP requirements since at least August 27, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Otay Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

### 2. The Sycamore Facility.

521. Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the Sycamore Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters as required by the General Industrial Permit, and fails to collect samples from all discharge locations.

522. Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator has failed to sample for all parameters required by Subchapter N. The 2016 Sycamore SWPPP acknowledges the Facility is "subject to Subchapter N ELGs Category 445, Landfills as a Point Source Category." 2016 Sycamore SWPPP § 2.1.2. However, the Sycamore Facility fails to sample for almost all of these required parameters, with the exception of TSS and pH, which are basic parameters required to be monitored by all industrial facilities covered by the General Industrial Permit.

523. On June 25, 2019, the Sycamore Facility Owner and/or Operator uploaded an attachment to its Annual Report for the 2018–2019 Reporting Period to the SMARTS database which again acknowledges that the Facility is subject to Subchapter N, but which insinuates the Facility does not need to analyze storm water samples for Subchapter N parameters because it does not discharge "contaminated storm water."

524. The 2018–2019 Annual Report claims the landfill is configured to prevent the discharge of storm water that comes into direct contact with landfill waste, the waste handling and treatment areas, landfill leachate, landfill gas condensate, and other landfill

1  wastewater. The document also claims that any such waters "are routed to the landfill's

2  leachate collection system and are hauled off site for disposal at the local Publicly Owned

3  Treatment Works." However, neither of these claims are backed by evidence and the

4  Facility has provided no further explanation in support of these conclusory statements.

5  525.  Plaintiffs are informed, believe, and thereon allege the Sycamore Facility's

6  SWPPPs, site maps, and other documents fail to indicate that the Facility has

7  implemented BMPs that would prevent all storm water from coming into contact with

8  landfill waste, the waste handling and treatment areas, or other landfill wastewater;

9  separate contaminated storm water from other storm water at the Facility; entirely prevent

10  the discharge of contaminated storm water; and/or route all contaminated storm water to

11  the leachate collection system.

12  526.  As the Facility has failed to analyze any storm water discharges for all

13  Subchapter N parameters, the Sycamore Facility Owner and/or Operator has violated and

14  continues to violate Section XI.B.6.g of the 2015 Permit.

15  527.  Plaintiffs are informed, believe, and thereon allege the Sycamore Facility

16  Owner and/or Operator has failed to sample for several constituents likely to be present at

17  the Facility in violation of section XI.B.6.c of the 2015 Permit. For example, despite

18  engaging in landfill operations, the Facility Owner and/or Operator only samples for the

19  minimum parameters of TSS, O&G, pH, and iron.

20  528.  The Sycamore Facility Owner and/or Operator's own monitoring data

21  indicates that storm water discharged on December 17, 2014, contained N+N at a

22  concentration of 3.63 mg/L. This sample collected far exceeded the Basin Plan Objective

23  standard for N+N of 1.0 mg/L, and EPA Benchmark of 0.68.

24  529.  The Sycamore Facility Owner and/or Operator ceased sampling for N+N

25  after December 17, 2014, without providing explanation or implementing any BMPs to

26  reduce and/or prevent discharges of N+N in the Facility's storm water.

27  530.  This evidence indicates that nitrogen-based compounds and other nutrients

28  are present at the Sycamore Facility, yet the Facility Owner and/or Operator continues to

fail to analyze samples for any indicator bacteria or nutrients in violation of the General Industrial Permit. *See* 1997 Permit § B.5.c; 2015 Permit § XI.B.6.c.

531.    Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a M&RP that requires the collection of storm water samples from all discharge locations at each Facility in violation of Section XI.B.4 of the 2015 Permit.

532.    Plaintiffs are informed, believe, and thereon allege that storm water likely discharges from the Sycamore Facility at points other than SYC-1. For example, there are multiple storm water drain inlets along the internal paved road within DA-3. Waste hauling vehicles frequently travel along this road, and thus industrial activity occurs along this road. Storm water from these areas does not collect in a sediment or detention basin to settle out solids and other pollutants before it is discharged. However, the Sycamore Facility Owner and/or Operator has never collected storm water samples from these drainage inlets and/or discharge locations.

533.    Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed to collect samples from each discharge point in violation of the General Industrial Permit. For example, the Sycamore Facility has collected storm water from only a single drainage point for each sample collected over the past five years, despite the multiple storm drain inlets along the internal paved road within DA-3.

534.    Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed to collect samples for the requisite number of QSEs. For example, the Sycamore Facility only collected one total sample during the 2015–16 reporting period, failed to collect any samples from July 1 to December 31 in 2016 during the 2016–17 reporting period, failed to collect any samples during the 2017–18 reporting period, has only collected one sample during the current 2018–19 reporting period, and has not collected or analyzed any storm water samples in 2019 despite numerous heavy rainfalls in January and February.

535.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

536.   Every day the Sycamore Facility operates with an inadequately developed and/or implemented M&RP, or with an improperly revised M&RP, is a separate and distinct violation of the General Industrial Permit and the Clean Water Act. The Sycamore Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit M&RP requirements since at least August 27, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Sycamore Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

**H.    Defendants Have Failed to Comply with the General Industrial Permit's Reporting Requirements.**

537.   Plaintiffs are informed, believe, and thereon allege the Republic Owners and/or Operators have failed and continue to fail to submit Annual Reports that comply with the General Industrial Permit reporting requirements.

538.   In each Annual Report since the filing of the 2013−14 Annual Report, the Republic Owners and/or Operators certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance.

539.   Plaintiffs are informed, believe, and thereon allege the Republic Facilities have failed and continue to fail to update the SWPPPs' BMPs to address existing potential pollutant sources. For example, storm water samples collected from the Facilities contain concentrations of pollutants above EPA Benchmarks, thus demonstrating that the Facilities' BMPs do not adequately address existing potential

1    pollutant sources.

2    540.    Plaintiffs are informed, believe, and thereon allege the Facilities' SWPPPs

3    do not include many elements required by the General Industrial Permit, and thus it is

4    erroneous to certify that the SWPPPs comply with the General Industrial Permit.

5    541.    Facility operators must report any noncompliance with the General

6    Industrial Permit at the time that the Annual Report is submitted, including (1) a

7    description of the noncompliance and its cause, (2) the period of noncompliance, (3) if

8    the noncompliance has not been corrected, the anticipated time it is expected to continue,

9    and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance.

10    1997 Permit, § C.11.d; 2015 Permit, § XVI.B.2.

11    542.    Plaintiffs are informed, believe, and thereon allege that the Republic Owners

12    and/or Operators have failed to report numerous instances of non-compliance as required

13    by the General Industrial Permit.

14    543.    Each day Defendants have operated and continue to operate the Facilities

15    without meeting each reporting requirement of the General Industrial Permit constitutes a

16    separate violation of the Permit and the CWA.

17    **1. The Otay Facility.**

18    544.    Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner

19    and/or Operator has failed and continues to fail to submit Annual Reports that comply

20    with the General Industrial Permit reporting requirements. For example, the Facility

21    Owner and/or Operator simply failed to upload an Annual Report to the SMARTS

22    database for the reporting period of 2014−2015.

23    545.    Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner

24    and/or Operator has failed and continues to fail to submit Annual Reports that accurately

25    state number of discharge points at the Facility. For example, the Annual Reports from

26    2013−14 and 2015−16 stated that there were only three storm water discharge locations

27    at the Facility, while the 2015 SWPPP identified the four discharge points where samples

28    are collected, OTY-2, OTY-3, OTX-1, and OTX-2. The 2015 site map further

acknowledged the existence of DP-3A, DP-3B, DP-3C, DP-4B, DP-4C, DP-4D, and DP-4E.

546.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that accurately state which pollutants are present at the Facility. For example, the 2015–16 Annual Report indicates that iron was not present at the Facility while the Facility's own monitoring data indicates high levels of iron in exceedance of EPA Benchmarks and Basin Plan Objectives.

547.   Each Annual Report states that nitrogen is not present at the Otay Facility, when the Facility's own monitoring data shows that levels of N+N exceeded EPA Benchmarks and NAL standards in 2014, indicating that the Facility's storm water discharges contain high concentrations of nitrogen.

548.   Given that the Otay Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the General Industrial Permit, the Otay Facility Owner and/or Operator is in daily violation of the General Industrial Permit. Every day the Otay Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the General Industrial Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Otay Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit's reporting requirements every day since at least August 27, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Otay Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

### 2.  The Sycamore Facility.

549.   Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the General Industrial Permit reporting requirements. For example, the

Facility Owner and/or Operator simply failed to upload an Annual Report to the SMARTS database for the reporting period of 2017–2018.

550.   Plaintiffs are informed, believe, and thereon allege the lists of pollutants identified within the impaired watershed for the Sycamore Facility's 2015–16 and 2016–17 Annual Reports are erroneous. For example, these Annual Reports indicate that N+N and total nitrogen were not present at the Facility. However, the Facility's own monitoring data from 2014 indicates high levels of N+N were discharged from the Facility.

551.   The Sycamore Facility's 2015–16 and 2016–17 Annual Reports also state that enterococcus, fecal coliform, manganese, selenium, phosphorus, and total dissolved solids were not present at the Facility. However, Plaintiffs are informed, believe, and thereon allege that all of these pollutants are commonly present in the Facility's storm water discharges.

552.   Given that the Sycamore Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the General Industrial Permit, the Sycamore Facility Owner and/or Operator is in daily violation of the General Industrial Permit. Every day the Sycamore Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the General Industrial Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Sycamore Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit's reporting requirements every day since at least August 27, 2014. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Sycamore Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since August 27, 2014.

/ / /

/ / /

I.     **The Republic Owners and/or Operators Fail to Comply with Level 1 and Level 2 Exceedance Response Action Requirements.**

1.  **The Otay Facility's Violations of ERA Requirements.**

553.   In September 2016, the Otay Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for TSS and iron ("2016 Otay Level 1 ERA Report").

554.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. For example, the evaluation allegedly included a review of the SWPPP, the M&RP, BMPs and the Facility site map. Yet, based on the evaluation, the 2016 Otay Level 1 ERA Report claims the SWPPP is adequate. 2016 Otay Level 1 ERA Report at 3.

555.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed and continues to fail to adequately revise the Otay Facility SWPPPs to include additional BMPs necessary to prevent future NAL exceedances, as required by the General Industrial Permit. *See* 2015 Permit, § XII. Thus, Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed and continues to fail to comply with Section XII of the 2015 Permit.

556.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator's discussion of NAL exceedances for TSS and iron in the 2016 Otay Level 1 ERA Report is inadequate. For example, rather than conducting an evaluation to identify the BMPs implemented at the Facility that correspond to the NAL exceedances at the Facility, the TSS Level 1 ERA Report notes that the only "likely source" of TSS at the Facility is "background soils and slopes." 2016 Otay Level 1 ERA Report at 4. Similarly, the Report states that the likely source of iron in the Facility's discharges is "non-industrial, natural background."

557.   While the 2016 Otay Level 1 ERA Report acknowledges that Landfill activity, vehicle traffic on roadways, unpaved surfaces, slopes, and wind-blown sediment

are "potential" sources of TSS, the Report lacks the required detail and site-specific evaluation and analysis required by the 2015 Permit. Accordingly, the 2016 Otay Level 1 ERA Report fails to meet the requirements of Section XII.C of the 2015 Permit.

558.   In December 2017, the Otay Facility Owner and/or Operator published the Level 2 ERA Action Plan, which is publicly available on the SMARTS online database ("2017 Otay ERA Level 2 Action Plan").

559.   The Otay Facility Owner and/or Operator is in Level 2 status for TSS and iron based on NAL exceedances during the 2015−16, 2016−17, and 2017−18 reporting years. For example, in the 2017−18 reporting year, the annual average amount of iron in analytical results for the was 10.33 mg/L, over ten times over the annual NAL for iron of 1.0 mg/L, and the annual average for TSS was 245, over double the annual NAL for TSS of 100 mg/L. *See* 2015 Permit Table 2.

560.   The 2015 Permit requires that a Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit § XII.D.1.c.

561.   Plaintiffs are informed, believe, and thereon allege the Otay Facility Owner and/or Operator has failed to collect samples from each drainage area and discharge point. For example, the Facility has only collected one sample from OTY-3, which contains pollutants from DA-4A and DA-6. Numerous industrial activities occur in DA-4 and DA-6 including the active face of landfill, the industrial activity which poses the greatest risk of pollutant mobilization via storm water or non-storm exposure.

562.   There is no detention basin in DA-6, and thus Plaintiffs are informed, believe, and thereon allege that OTY-3 likely discharges storm water during each QSE.

563.   The Otay Facility has infrequently sampled storm water from OTX-1 and OTX-2, and has not sampled from these discharge points since May 12, 2017, when it sampled OTX-1 and OTX-2 for TSS only.

564.   Plaintiffs are informed, believe, and thereon allege that because the Facility has failed to monitor storm water from each drainage area and discharge point, the

Facility has also failed to provide accurate sampling data and information in violation of the General Industrial Permit's ERA Requirements.

565.   On December 31, 2018, the Otay Facility Owner and/or Operator published a soil background study ("2018 Otay ERA Soil Background Study" or "2018 Otay Soil Study") arguing that an increase is needed for the "NAL for total iron to 2.8 mg/L total iron, [as] the iron level associated with the current allowable annual average TSS concentrations of 100 mg/L."

566.   Section XII.D.2.c.i of the 2015 Permit requires that natural background pollutant source determinations, like the soil background study, must prove that iron is solely in background soil "that has not been disturbed by industrial activities."

567.   Plaintiffs are informed, believe, and thereon allege that the 2018 Otay ERA Soil Background Study fails to meet these requirements. The Otay Facility Owner and/or Operator is constantly disturbing soil as a part of industrial activities and the 2018 Otay Soil Study fails to acknowledge this.

568.   Plaintiffs are informed, believe, and thereon allege the results of the 2018 Otay Soil Study are highly self-serving, and break down when held against the Facility's own monitoring data. For example, while the 2018 Otay Soil Study claims that the total iron concentration in soil was calculated to be 2.8% to 3.8% total iron, the Facility's own data from January 15, 2019 shows TSS at 92 mg/L, and iron at 7.86 mg/L.

569.   If, according to the 2018 Otay Soil Study's findings, iron at the Otay Facility solely comes from background soil concentrations, the concentration of iron in the January 15, 2019 sample should have been a maximum of approximately 3.5 mg/L. That the actual concentration of iron was more than double this figure indicates that significant sources of iron exist on the Facility aside from the background quantity in the soil. As such, the 2018 Otay ERA Soil Background Study fails to meet the requirements of Section XII.D.2.c.i of the 2015 Permit.

570.   The Otay Facility Owner and/or Operator has failed and continues to fail to conduct an adequate Level 1 status evaluation and report that complies with the General

Industrial Permit. Additionally, the Otay Facility Owner and/or Operator has failed and continues to fail to comply with ERA Level 2 requirements. As such, the Otay Facility Owner and/or Operator is in daily violation of the General Industrial Permit.

571.    Every day the Otay Facility Owner and/or Operator conducts operations at the Otay Facility without an adequate Level 1 status evaluation and/or without submitting adequate Level 1 and/or Level 2 ERA Reports and Studies is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

572.    The Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016. The Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit for failing to submit adequate ERA Reports every day since January 1, 2017. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available.

573.    The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and General Industrial Permit's Level 1 status ERA evaluation requirements every day since October 1, 2016.

574.    The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and General Industrial Permit's Level 1 ERA Report requirements every day since January 1, 2017.

## 2.  The Sycamore Facility's Violations of ERA Requirements.

575.    The Sycamore Facility entered Level 1 status for TSS and iron following the 2015–16 reporting period, during which the Facility's annual average for TSS was 351 mg/L, over three times higher than the annual NAL of 100 mg/L, and the annual average for iron was 11.9 mg/L, over eleven times higher than the annual NAL of 1.0 mg/L.

576.    Accordingly, in September 2016, the Sycamore Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for TSS and iron

("2016 Sycamore Level 1 ERA Report").

577. Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. For example, the evaluation allegedly included a review of the SWPPP, the M&RP, BMPs and the Facility site map. Yet, based on the evaluation, the Level 1 ERA Report claims the SWPPP is adequate. 2016 Sycamore Level 1 ERA Report § 4. Thus, Plaintiffs are informed, believe, and thereon allege the Sycamore Facility Owner and/or Operator has failed and continues to fail to comply with Section XII of the 2015 Permit.

578. Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed and continues to fail to adequately revise the Sycamore Facility SWPPPs to include additional BMPs necessary to prevent future NAL exceedances at the Facility, as required by the General Industrial Permit. *See* 2015 Permit § XII.

579. Plaintiffs are informed, believe, and thereon allege the discussion of NAL exceedances for TSS and iron in the 2016 Sycamore Level 1 ERA Report is inadequate. For example, rather than conducting an evaluation to identify the BMPs implemented at the Facility that correspond to the NAL exceedances at the Facility, the TSS Level 1 ERA Report notes that the only "likely source" of TSS and iron at the Facility is "non-industrial, natural background." 2016 Sycamore Level 1 ERA Report § 5.

580. The 2016 Sycamore Level 1 ERA Report claims that the only potential sources of these pollutants are landfill slopes, background iron, and soils from sedimentation basins. *Id*. Hence, the 2016 Sycamore Level 1 ERA Report lacks the required detail and site-specific evaluation and analysis required by the 2015 Permit. Accordingly, among other reasons, the 2016 Sycamore Level 1 ERA Report fails to meet the requirements of Section XII.C of the 2015 Permit.

581. The Sycamore Facility Owner and/or Operator entered Level 2 status for

TSS and iron based on NAL exceedances of an annual average of 112 mg/L for TSS and 5.58 mg/L for iron during the 2015−16, 2016−17, and 2017−18 reporting periods.

582.   Accordingly, in December 2017, the Sycamore Facility Owner and/or Operator published the Level 2 ERA Action Plan, which is publicly available on the SMARTS online database ("2017 Sycamore ERA Level 2 Action Plan").

583.   The Sycamore Facility thereafter failed to collect any storm water samples during the 2017−18 reporting period, and thus remained in Level 2 status for both TSS and iron.

584.   The 2015 Permits requires that a Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit § XII.D.1.c.

585.   Plaintiffs are informed, believe, and thereon allege that the Sycamore Facility Owner and/or Operator has failed to collect samples from each drainage area and all discharge points. For example, information available to Plaintiffs indicates that the Facility discharges storm water from the eastern side of the Facility, and yet has failed to collect any samples from such discharges. As such, the 2017 Sycamore ERA Level 2 Action Plan fails to address these discharges in violation of the General Industrial Permit.

586.   Plaintiffs are informed, believe, and thereon allege that storm water from DA-1 flows down slopes and roads into DA-2, where it is thereafter discharged from various detention basins and potentially discharged from the Facility at SYC-1. However, the 2017 Sycamore ERA Level 2 Action Plan states that NAL exceedances are not applicable to DA-1.

587.   On December 31, 2018, the Sycamore Facility Owner and/or Operator published a soil background study ("2018 Sycamore ERA Soil Background Study" or "2018 Sycamore Soil Study"), which claims that "the background threshold value (BTV) for total iron concentration in soil was calculated to be 2.8% total iron." In light of this claim, the 2018 Sycamore Soil Study requested that the NAL for total iron be increased to 2.8 mg/L total iron, "the iron level associated with the current allowable annual

average TSS concentrations of 100 mg/L."

588.   Section XII.D.2.c.i of the 2015 Permit requires that natural background pollutant source determinations, like the soil background study, must prove that iron is solely in background soil "that has not been disturbed by industrial activities."

589.   Plaintiffs are informed, believe, and thereon allege the 2018 Sycamore ERA Soil Background Study fails to meet these requirements. The Sycamore Facility Owner and/or Operator is constantly disturbing soil as a part of industrial activities and the 2018 Sycamore Soil Study fails to acknowledge this.

590.   Plaintiffs are informed, believe, and thereon allege the results of the 2018 Sycamore Soil Study are highly self-serving, and break down when held against the Facility's own monitoring data. For example, while the Soil Study claims that the total iron concentration in soil was calculated to be 2.8% to 3.8% total iron, the Facility's own data from February 22, 2017 shows TSS to be 112 mg/L, and iron to be 5.73 mg/L.

591.   If, according to the soil study's findings, iron at the Facility solely comes from background soil concentrations, the concentration of iron in the February 22, 2017 sample should have been a maximum of approximately 4.26 mg/L. That the actual concentration of iron was higher than this figure, indicates that significant sources of iron exist on the Facility aside from the background quantity in the soil. As such, the 2018 Sycamore ERA Soil Background Study fails to meet the requirements of Section XII.D.2.c.i of the 2015 Permit.

592.   The Sycamore Facility Owner and/or Operator has failed and continues to fail to conduct an adequate Level 1 status evaluation and report that complies with the General Industrial Permit. Additionally, the Facility Owner and/or Operator has failed and continues to fail to comply with ERA Level 2 requirements. As such, the Facility Owner and/or Operator is in daily violation of the General Industrial Permit.

593.   Every day the Sycamore Facility Owner and/or Operator conducts operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 and/or Level 2 ERA Reports and Studies is a separate and

distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

594.   The Sycamore Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016. The Facility Owner and/or Operator has been in daily and continuous violation of the General Industrial Permit for failing to submit adequate ERA Reports every day since January 1, 2017. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and General Industrial Permit's Level 1 status ERA evaluation requirements every day since October 1, 2016. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act and General Industrial Permit's Level 1 ERA Report requirements every day since January 1, 2017.

**J.    The Otay Facility Has Violated and Continues to Violate the Terms of Conditional Waiver No. 5.**

595.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility Owner and/or Operators enrolled under Conditional Waiver No. 5 as this Facility engages in composting industrial activities.

596.   Plaintiffs are informed, believe, and thereon allege that the Otay Facility's wastes, additives, amendments and other industrial materials from the Facility's composting actives are present in the Facility's storm water discharges and adversely impact the quality and beneficial uses of Receiving Waters.

597.   Regional Board Order No. R9-2016-0067 noted that during an inspection on February 4, 2016, "staff observed leachate runoff from the up gradient composting, and chip and grinding operations" at the Otay Facility.

598.   Regional Board Order No. R9-2016-0067 states that "rainfall after coming into contact with compost piles constitutes a waste stream or wastewater and therefore cannot be comingled in a storm water basin. . . . If the wastewater stored in the East

Storm Water Basin were to be discharged offsite into the Municipal Separate Storm Sewer Systems (MS4s) or surface waters; then the discharge would be in violation of IGP, sections III.B-III.D, and Order No. R9-2014-0041 -Waiver No.5, Discharges of Waste to Land at Composting Facilities."

599.   On January 18, 2018, a Local Enforcement Agency inspection again found that uncovered food waste within the composting area had discharged liquid leachate from the compost piles.

600.   Plaintiffs are informed, believe, and thereon allege that Otay Facility SWPPPs fail to identify BMPs that would prevent storm water from commingling with liquid leachate or waste water from contact with composting materials.

601.   Plaintiffs are informed, believe, and thereon allege that Otay Facility SWPPPs fail to identify BMPs that would prevent the Facility from illegally discharging waste water in violation of Section III.B–III.D of the 2015 Permit, and Conditional Water No. 5.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

602.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

603.   Plaintiffs are informed and believe, and thereon allege, that prohibited non-storm water discharges have discharged and continue to discharge from the each of the Republic Facilities.

604.   The Republic Owners and/or Operators' failure to prevent unauthorized non-storm water discharges is a violation of the General Industrial Permit and the CWA. 1997 Permit § A.1; 2015 Permit § III.B; 33 U.S.C. § 1311(a).

605.   Plaintiffs are informed and believe, and thereon allege, that the Republic

Owners and/or Operators violated and will continue to violate this General Industrial Permit Discharge Prohibition each and every time unauthorized non-storm water discharges from each of the Republic Facilities.

606.   Plaintiffs are informed and believe, and thereon allege, that the Republic Owners and/or Operators have discharged and continue to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 Permit.

607.   Plaintiffs are informed and believe, and thereon allege, that the Republic Owners and/or Operators have discharged and continue to discharge numerous pollutants in excess of water quality objectives listed in the San Diego Basin Plan in violation of Section III.D of the 2015 Permit.

608.   Plaintiffs are informed and believe, and thereon allege, that the Republic Owners and/or Operators have been in violation of the General Industrial Permit Discharge Prohibition at each of the Republic Facilities every day from August 27, 2014 to the present.

609.   Plaintiffs are informed and believe, and thereon allege, that the Republic Owners and/or Operators' violations of the General Industrial Permit Discharges Prohibitions are ongoing and continuous.

610.   Each and every violation of the General Industrial Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

611.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

612.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

613.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

614.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

615.   Plaintiffs are informed and believe, and thereon allege, that the Republic Owners and/or Operators failed and continue to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facilities.

616.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facilities.

617.   The Republic Owners and/or Operators' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facilities is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; *see also* 33 U.S.C. § 1311(b).

618.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators violated and continue to violate the General Industrial Permit Effluent Limitation each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facilities.

619.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit Effluent Limitation at the Facilities every day from August 27, 2014 to the present.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES   99

620.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit Effluent Limitation and the Clean Water Act are ongoing and continuous.

621.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facilities.

622.   Each day that Defendants operate the Facilities without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

623.   Each day that Defendants operate the Facilities without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

624.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

625.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

626.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

/ / /

/ / /

/ / /

/ / /

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of General Industrial Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

627.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

628.    Plaintiffs are informed and believe, and thereon allege that the Republic Facilities discharge storm water containing levels of pollutants that adversely impact human health and/or the environment.

629.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators discharge storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facilities.

630.    Plaintiffs are informed and believe, and thereon allege that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

631.    Plaintiffs are informed and believe, and thereon allege that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facilities.

632.    The Republic Owners and/or Operators' discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §§ C.1–2; 2015 Permit §§ VI.A–B; *see also* 33 U.S.C. § 1311(b).

633.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators violated and will continue to violate the General Industrial Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the Facilities.

634.    Plaintiffs are informed and believe, and thereon allege that the Republic

Owners and/or Operators have been in violation of the General Industrial Permit Receiving Water Limitations every day from August 27, 2014 to the present.

635.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit Receiving Water Limitations and the CWA are ongoing and continuous.

636.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs is discharged from the Facilities.

637.   Each day that Defendants have discharged and/or continue to discharge polluted storm water from the Facilities in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

638.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

639.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

640.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the General Industrial Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

641.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

642.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to develop and/or implement adequate SWPPPs for the Facilities.

643.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to adequately revise the SWPPPs for the Facilities.

644.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators conduct operations at the Facilities each day without an adequately developed, implemented, and/or revised SWPPP.

645.   The Republic Owners and/or Operators' failure to adequately develop, implement, and/or revise SWPPPs for the Facilities is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit § A; 2015 Permit § X; *see also* 33 U.S.C. § 1311(b).

646.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit SWPPP requirements at the Facilities every day from August 27, 2014 to the present.

647.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit SWPPP requirements and the CWA at the Facilities are ongoing and continuous.

648.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the SWPPPs for the Facilities.

649.   Each day that Defendants operate the Facilities without developing and/or implementing adequate SWPPPs is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a).

650.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present, pursuant to

Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

651.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

652.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring and Reporting Plans in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

653.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

654.   Plaintiffs are informed and believe, and thereon allege, that the Republic Owners and/or Operators have failed and continue to fail to develop and/or implement an adequate M&RP for the Facilities.

655.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to adequately revise the M&RP for the Facilities.

656.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators conduct operations at the Facilities each day without adequately developed, implemented, and/or revised M&RPs.

657.   The Defendants' failure to adequately develop, implement, and/or revise the M&RPs for the Facilities is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit § B; 2015 Permit § XI; *see also* 33 U.S.C. § 1311(b).

658.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in violation of the General Industrial Permit M&RP

requirements every day from August 27, 2014 to the present.

659.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the General Industrial Permit M&RP requirements and the CWA at the Facilities are ongoing and continuous.

660.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the M&RP for the Facilities.

661.   Each day that Defendants operate the Facilities without developing, implementing, and/or revising an adequate M&RP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

662.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

663.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

664.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the General Industrial Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

665.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

666.   Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to submit accurate and/or complete Annual Reports for the

1 Facilities.

2     667.   The Defendants' failure to submit complete and accurate Annual Reports is

3 a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit

4 §§ B.14, C.9–10; 2015 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

5     668.   Plaintiffs are informed and believe, and thereon allege that the Republic

6 Owners and/or Operators conduct operations at the Facilities each day without reporting

7 as required by the General Industrial Permit.

8     669.   Plaintiffs are informed and believe, and thereon allege that Defendants have

9 been in violation of the General Industrial Permit's reporting requirements every day

10 since at least August 27, 2014.

11     670.   Plaintiffs are informed and believe, and thereon allege that Defendants'

12 violations of the reporting requirements of the General Industrial Permit and the CWA

13 are ongoing and continuous.

14     671.   Defendants will continue to be in violation of the General Industrial Permit

15 and the CWA each and every day they fail to comply with the General Industrial Permit

16 reporting requirements at the Facilities.

17     672.   Each and every violation of the General Industrial Permit reporting

18 requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.

19 § 1311(a).

20     673.   By committing the acts and omissions alleged above, Defendants are subject

21 to an assessment of civil penalties for each and every violation of the CWA occurring

22 from August 27, 2014 to the present pursuant to Sections 309(d) and 505 of the CWA,

23 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

24     674.   An action for injunctive relief under the CWA is authorized by Section

25 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and

26 omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs

27 have no plain, speedy, or adequate remedy at law.

28     675.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES   106

an actual controversy exists as to the rights and other legal relations of the Parties.

## SEVENTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the General Industrial Permit.
33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

676.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

677.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to conduct the requisite visual observations of storm water discharges at the Facilities.

678.   The Republic Owners and/or Operators' failure to conduct the requisite visual observations at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.3–4; 2015 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

679.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed to collect and analyze the required number of storm water samples the Facilities.

680.   The Republic Owners and/or Operators' failure to collect and analyze the required number of storm water samples at the Facilities is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.a–b, 2015 Permit §§ XI.B.1–3; *see also* 33 U.S.C. § 1311(b).

681.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to analyze all collected samples for all required parameters.

682.   The Republic Owner and/or Operators' failure to analyze all collected samples for all required parameters is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 Permit §§ XI.B.6, XI.D; *see also* 33 U.S.C. § 1311(b).

683.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to comply with the General

Industrial Permit's monitoring requirements at the Facilities since August 27, 2014.

684.   Plaintiffs are informed and believe, and thereon allege that several of the Republic Owners and/or Operators' violations of the General Industrial Permit monitoring requirements and the Clean Water Act are ongoing and continuous.

685.   The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit's monitoring requirements.

686.   Each and every violation of the General Industrial Permit's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

687.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 27, 2014 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

688.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

689.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## EIGHTH CAUSE OF ACTION

### Failure to Comply with ERA Requirements in Violation of the General Industrial Permit and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

690.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

691.   Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to conduct adequate Level 1

ERA status evaluations for the Facilities.

692.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have failed and continue to fail to submit adequate Level 1 ERA Reports for the Facilities.

693.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators conduct operations at the Facilities each day without having conducted an adequate Level 1 ERA status evaluation and/or without having submitted an adequate Level 1 ERA Report.

694.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' failure to conduct adequate Level 1 evaluations and/or file adequate Level 1 ERA Reports is a violation of the General Industrial Permit. 2015 Permit, § XII(C).

695.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status evaluation requirements every day since at least October 1, 2016.

696.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status ERA reporting requirements every day since at least January 1, 2017.

697.    The Republic Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day the Owners and/or Operators fail to comply with the Level 1 ERA requirements.

698.    Plaintiffs are informed and believe, and thereon allege that the Republic Owners and/or Operators' violations of the Level 1 ERA requirements of the General Industrial Permit and the CWA are ongoing and continuous.

699.    Every day the Republic Owners and/or Operators conduct operations at the Facilities without conducting an adequate Level 1 status evaluation and/or a without

submitting an adequate Level 1 ERA Report, is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

700.   By committing the acts and omissions alleged above, the Republic Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Level 1 status evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

701.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

702.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## NINTH CAUSE OF ACTION

### Failure to Comply with Conditional Waiver No. 5 Requirements.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

703.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

704.   Plaintiffs are informed and believe, and thereon allege that The Otay Facility has failed and continues to fail to comply with the requirements of Conditional Waiver No. 5.

705.   Plaintiffs are informed and believe, and thereon allege that the Otay Facility discharges storm water contaminated with pollutants from the Facility's composting operations.

706.   These discharges constitute waste stream or wastewater discharges which

are prohibited by Section III.B–D of the 2015 Permit, and Conditional Waiver No.5.

707.    Plaintiffs are informed and believe, and thereon allege these discharges threaten to cause, or contribute to conditions of pollution, contamination, or nuisance in Receiving Waters, in violation of Conditional Waiver No. 5, Section B.2.

708.    Plaintiffs are informed and believe, and thereon allege that the Otay Facility has failed and continues to fail to implement BMPs that minimize or eliminate the discharge of pollutants that may adversely impact the quality or beneficial uses of waters in violation of Conditional Waiver No. 5, Section C.1.a.ii.

709.    Plaintiffs are informed and believe, and thereon allege that the Otay Facility Owner and/or Operator conducts operations at the Facility each day without implementing such BMPs and preventing such wastewater discharges as required by the Conditional Waiver No. 5.

710.    Plaintiffs are informed and believe, and thereon allege that the Otay Facility Owner and/or Operator has been in violation of Conditional Waiver No. 5's requirements every day since at least August 27, 2014.

711.    Plaintiffs are informed and believe, and thereon allege that Otay Facility Owner and/or Operator's violations of the requirements of Conditional Waiver No. 5 are ongoing and continuous.

712.    The Otay Facility Owner and/or Operator will continue to be in violation of the Conditional Waiver No. 5 each and every day they fail to comply with the aforementioned requirements.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

713.    Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendants to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facilities in violation of a permit issued pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), for failing to meet

effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the General Industrial Permit;

b.     A court order enjoining Defendants from discharging pollutants without a NPDES permit;

c.     A court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the General Industrial Permit, Conditional Waiver, and the Clean Water Act;

d.     A court order assessing civil monetary penalties for each violation of the Clean Water Act at $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009, and $54,833.00 per day per violation for violations that occurred after November 2, 2015, as permitted by Clean Water Act Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

e.     A court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1    f.    Any other relief as this Court may deem appropriate.

2  Dated: November 21, 2019

3                                    Respectfully submitted,

4                                    COAST LAW GROUP LLP

5

6                                    By: s/Livia B. Beaudin
                                     LIVIA B. BEAUDIN
7                                    Attorney for Plaintiffs
                                     COASTAL ENVIRONMENTAL
8                                    RIGHTS FOUNDATION
9                                    E-mail: livia@coastlawgroup.com

10

11                                   SAN DIEGO COASTKEEPER

12

13                                   By: s/Matt O'Malley
                                     MATT O'MALLEY
14                                   Attorney for Plaintiffs
15                                   SAN DIEGO COASTKEEPER
                                     E-mail: matt@sdcoastkeeper.org
16

17

18

19

20

21

22

23

24

25

26

27

28